JAY W. EDELBERG and CARAL S. EDELBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edelberg v. Commissioner
Docket No. 14735-93.
United States Tax Court
T.C. Memo 1995-386; 1995 Tax Ct. Memo LEXIS 382; 70 T.C.M. (CCH) 393; August 14, 1995, Filed *382 Decision will be entered under Rule 155. Lloyd T. Asbury, for petitioners. Steve R. Johnson, for respondent. SWIFT, Judge SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies of $ 18,242, $ 18,612, and $ 24,553, respectively, in petitioners' 1988, 1989, and 1990 Federal income tax. After settlement of some issues, the issue for decision is whether certain income received by petitioners during 1988, 1989, and 1990 qualifies as passive income under section 469. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioners resided in Jacksonville, Florida. All references to petitioner in the singular are to Caral Edelberg. In 1982, petitioner incorporated in Maryland Datamed Management Systems, Inc. (Datamed), as a subchapter S corporation, to provide billing and collection services to physicians that specialized in providing medical treatment in emergency rooms of hospitals. Datamed's principal place of business *383 was located in Vienna, Virginia. The emergency room physicians would send to Datamed information on medical treatment provided to patients, and Datamed would then bill the patients and follow up with appropriate collection services. The physicians would pay Datamed a fee for Datamed's billing and collection services based either on a fixed fee per patient billed or a fixed percentage of payments actually collected. Until 1986, petitioner was director, president, and sole shareholder of Datamed. Datamed's principal client was Emergency Physicians, Inc. (EPI), an incorporated group of emergency room physicians who practiced at hospitals in the Jacksonville, Florida, metropolitan area. Petitioner Jay Edelberg (Edelberg), also an emergency room physician with a practice in Jacksonville, Florida, was EPI's principal shareholder. Datamed had provided billing and collection services to EPI since 1983. The particular agreement between Datamed and EPI provided that EPI would pay Datamed for Datamed's billing and collection services a fixed fee of 14 percent of payments actually collected from EPI's patients. In addition to providing billing and collection services to EPI, Datamed provided *384 billing and collection services for five or six other groups of emergency room physicians, including Emergency Medical Association of Bayside, Inc. (Bayside), located in Virginia, and Capital Emergency Associates (Capital), located in Texas. Datamed's business with EPI was larger than its business with Bayside and Capital combined. From the time of their marriage in 1981 until the fall of 1986, petitioners maintained separate residences. Due to the location of Datamed's office in Virginia, petitioner lived in Northern Virginia, and due to the location of his medical practice in Florida, Edelberg lived in Jacksonville, Florida. Because of her marriage to Edelberg and of her business dealings with EPI, petitioner was a close acquaintance of many physicians who used Datamed's billing and collection services. By the summer of 1986, Datamed was experiencing operational and financial difficulties that frequently resulted in a 4 to 6 week delay in billing patients. Because of Datamed's difficulties, petitioner and Edelberg personally guaranteed $ 450,000 of Datamed's outstanding debt. In an effort to reduce Datamed's operational costs, petitioner investigated the feasibility of relocating *385 Datamed's operations to Jacksonville, Florida, where EPI was located. Moving Datamed to Jacksonville would allow Datamed to handle billing and collection services for EPI more efficiently and profitably, and the relocation of Datamed to Florida would eliminate petitioners' costs of maintaining separate residences. In August of 1986, petitioner was close to signing a lease for office space in Jacksonville, Florida, to which Datamed's operations would be relocated. At that time, however, petitioner was contacted by Melvin Gottlieb (Gottlieb), president and sole shareholder of Gottlieb's Financial Services, Inc. (GFS), which company was also located in Jacksonville, Florida, and which company also provided billing and collection services to emergency room physicians. GFS was a major competitor of Datamed. Gottlieb expressed concern to petitioner that Datamed's relocation to Jacksonville, Florida, would damage both GFS' and Datamed's business. In subsequent negotiations, Gottlieb proposed a merger between Datamed and GFS. Petitioner rejected Gottlieb's merger proposal, but petitioner made a counter offer to sell her shares of Datamed stock to GFS for $ 450,000 in cash. The proposed *386 $ 450,000 consideration represented the minimum petitioner would accept on any sale of Datamed in order to have sufficient sales proceeds to pay off the portion of Datamed's debt that petitioners had guaranteed. In light of Datamed's financial difficulties, Gottlieb believed that $ 450,000 in up-front cash represented too high a price, and Gottlieb rejected petitioner's counter offer. Gottlieb, however, traveled to Virginia to inspect Datamed's operations. Gottlieb concluded that part of Datamed's business -- particularly the EPI account -- constituted a valuable asset and that if GFS could acquire that portion of Datamed's business, GFS likely would be able to double both the volume and profits of its billing and collection service business. Gottlieb was also aware of separate talks between petitioner and Sol Epstein (Epstein), a Pittsburgh, Pennsylvania, based competitor of both Datamed and GFS, about the possibility of a sale of Datamed's business to Epstein. Not wanting to lose the EPI account to another competitor and not wanting petitioner to relocate her billing and collection business to Jacksonville, Florida, Gottlieb, after further negotiations, entered into an oral agreement *387 with petitioner for the purchase from Datamed of the EPI account. Under the agreement, in consideration for the EPI account, GFS was required to pay petitioner a fixed fee of 80 cents for each patient of EPI that was subsequently billed by GFS, up to a maximum cumulative fee to be paid to petitioner of $ 450,000. Petitioner contacted each of the emergency room doctors that were affiliated with EPI to inform them that Datamed was discontinuing its billing and collection services for EPI and that GFS was taking over these services. EPI, familiar with GFS' business reputation and its billing and collection services, agreed to have billing and collection services regarding its patients transferred to GFS on the basis of the same fee arrangement that EPI had established with Datamed (namely, GFS would be paid not on a per-patient-billed basis, but on the basis of 14 percent of amounts actually collected from EPI patients). On October 1, 1986, pursuant to the above oral agreement between petitioner and Gottlieb, the EPI account was transferred from Datamed to GFS. Datamed ceased doing business, and on October 15, 1986, Datamed was dissolved. Thereafter, in compensation for GFS' billing *388 and collection services on its behalf, EPI paid GFS 14 percent of payments actually collected by GFS from EPI's patients, and GFS paid petitioner 80 cents for each patient billed on behalf of EPI. GFS' other clients paid GFS a fixed fee per patient billed, rather than a stated percentage of payments actually collected. On November 5, 1986, petitioner and Gottlieb formalized in writing their oral agreement for transfer to GFS of Datamed's relationship with EPI. The written agreement was labeled a "Service Agreement" and was signed by petitioner individually and by Gottlieb on behalf of GFS. With regard to amounts to be paid to petitioner, the written agreement reflected the understanding that GFS would pay petitioner a fixed fee of 80 cents for each EPI patient billed by GFS up to a cumulative total fee of $ 450,000. Under the agreement, after the transfer to GFS of the EPI account, petitioner had no obligation to perform any services. After the transfer, all billing and collection services and activities associated with the EPI account would be performed by GFS, not by petitioner. Pertinent parts of the written agreement between petitioner and GFS provide as follows: WHEREAS, *389 * * * [petitioner] has provided to GFS * * * [patients] to be processed and billed by it, and which were prior to October 1, 1986 billed by * * * [petitioner] * * * WHEREAS, GFS has agreed to bill these * * * [patients] to the best of its ability and by commonly accepted standards within the medical billing industry, and: WHEREAS, processing for the * * * [patients] was implemented by GFS on October 1, 1986 * * * NOW, THEREFORE, the following formula will be utilized to determine monthly amounts payable to * * * [petitioner] by GFS as a fee for the provision of these billing * * * [patients] until all monies paid by GFS to * * * [petitioner] equal $ 450,000.00 plus interest * * * SERVICE FORMULA Commencing October 1, 1986, GFS will pay eighty cents ($ .80) for every new * * * [patient], with a service date of October 1, 1986 or later, that GFS bills on behalf of * * * [EPI] * * * until all monies are paid to * * * [petitioner] as heretofore provided.
Based on Gottlieb's calculations, from servicing EPI patients, Gottlieb expected GFS to receive fees over and above the fixed fees that GFS typically received on collections for its other accounts, and Gottlieb believed that *390 by paying petitioner 80 cents for each patient GFS billed for EPI, GFS would obtain from Datamed the EPI account without reducing GFS' typical profit margin and without making any immediate out-of-pocket cash payment. After entering into the above agreement, petitioner had little contact with GFS other than to answer a few technical questions relating to transfer to GFS of the EPI account. Other than this contact, petitioner rendered no personal or consulting services to GFS. Petitioner was never considered an employee of GFS, and petitioner never received an ownership interest in GFS. As fees under the agreement between petitioner and GFS, petitioner received from GFS $ 60,832, $ 88,940, and $ 96,304 during 1988, 1989, and 1990, respectively -- a cumulative total of $ 246,076 -- based on the 80 cent per-patient-billed formula reflected in the agreement. Petitioners treated the above fees as passive income on their 1988, 1989, and 1990 joint Federal income tax returns. Petitioners offset this income on their joint returns with unrelated passive losses. On audit, respondent determined that the fees petitioner received from GFS during 1988, 1989, and 1990 did not qualify as passive *391 income, and respondent, therefore, did not allow this income to be offset by petitioners' passive losses. OPINION Issues arising under section 469 typically focus on whether a loss is to be properly characterized as a "passive" loss so that the taxpayer may utilize the loss to offset what the taxpayer and respondent agree is passive income. The issue in this case, however, although it involves the same attempted result (namely, the offset of passive income by passive losses), presents the question of whether the income in question is to be properly characterized under section 469 as "passive" income so that the taxpayer may offset the income by what petitioners and respondent agree are passive losses. In general, under section 469, a taxpayer's passive activity income can be offset by passive activity losses. If a taxpayer has no passive activity income, the taxpayer's passive activity losses must be carried forward to subsequent years. Sec. 469(b), (g). A passive activity is defined generally as an activity that involves: (1) The conduct of a trade or business; and (2) a trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). [1] Even if *392 an activity qualifies as a passive activity under the above two-pronged test of section 469(c)(1), income received by a taxpayer in connection with a passive activity will not be treated as income from a passive activity if the particular income constitutes compensation for personal services rendered by the taxpayer. Sec. 469(e)(3). [2]
Respondent argues that the income petitioner received in 1988, 1989, and 1990 from GFS constitutes income that was earned by petitioner not in connection with a trade or business of petitioner. Alternatively, *393 respondent argues that the income was received by petitioner as compensation for personal services that petitioner rendered to GFS and that under either theory the statutory requirements that must be satisfied to treat this income as passive income under section 469 have not been satisfied. Petitioners argue that the income received by petitioner from GFS did not represent compensation for personal services and that the income should be treated as received as part of the trade or business of GFS, and that because petitioner did not materially participate in the trade or business of GFS, both the trade or business requirement and the lack of material participation requirement of section 469(c)(1) are satisfied. Therefore, petitioners argue that the income in question should be treated as passive activity income and as eligible for offset by petitioners' passive losses. Petitioners implicitly acknowledge the following: (1) That in 1988, 1989, and 1990, when petitioner received the income in question, petitioner was no longer engaged in any business related to receipt of the income (petitioner having dissolved her billing and collection business in 1986 and having sold Datamed's and *394 her interest in the EPI account to GFS); and (2) that if the income received by petitioner from GFS is treated as received as part of the prior trade or business of Datamed, petitioner's material participation in Datamed's business would disqualify the income from passive income treatment. We first address respondent's alternative argument. Although petitioner and GFS labeled their agreement a "Service Agreement", we look to the specific terms of the Service Agreement to determine its substance. Wilson Athletic Goods Manufacturing Co. v. Commissioner, 222 F.2d 355, 357 (7th Cir. 1955), revg. T.C. Memo. 1954-163; Ballantine v. Commissioner, 46 T.C. 272, 277 (1966). The fact and the amount of the income petitioner received from GFS were not based on any personal services petitioner rendered or was required to render to GFS. Rather, the fact and the amount of the income were based solely on amounts GFS collected from patients of EPI as a result of medical services rendered to patients by EPI's doctors and as a result of GFS', not petitioner's, billing and collection services. The minimal services *395 petitioner rendered to GFS in connection with the transfer from Datamed to GFS of the EPI account were incidental to the transfer. Every such transfer of a business activity or asset inherently encompasses a degree of services and personal attention by the transferor to ensure that the transfer is effectively carried out. See Meurlin v. Commissioner, 25 T.C. 118, 122-123 (1955) (after selling deceased husband's medical practice, widow answered phones for 3 months to encourage decedent's former patients to use medical services of the purchaser of decedent's practice. Widow's services were treated as incidental to the sale of the medical practice, and payments to the widow represented capital expenditures.) The income petitioner received from GFS was not received in exchange for petitioner's personal services. Sec. 911(d)(2)(A). Other than insignificant services inherent in transferring to GFS the EPI account, petitioner rendered no personal services to GFS. We conclude that respondent's alternative theory (that the income petitioner received from GFS represented income for personal services rendered by petitioner) is improper. [3]
*396 With regard, however, to respondent's primary argument (that petitioner in 1988, 1989, and 1990, was not engaged in a trade or business with regard to the activity giving rise to the income in question and therefore that such income does not qualify under section 469(c)(1)(A) as passive income), we agree with respondent. As noted, petitioners argue that under the trade or business requirement of section 469(c)(1)(A), the taxpayer need not be personally involved in the conduct of a trade or business or need not personally own an interest in an entity that is engaged in the conduct of a trade or business. Petitioners argue that the conduct by GFS of a billing and collection business out of which the income in question was paid to petitioner satisfies the trade or business requirement of section 469(c)(1)(A) with respect to the income petitioner received from GFS in 1988, 1989, and 1990. Petitioners' argument is based on a misreading of section 469(c)(1). Concededly, the language of section 469 is imprecise and complex. Implicit, however, in the language of section 469 is the concept that the trade-or-business requirement of section 469(c)(1) requires that in order for income to be *397 treated as "passive" income (and not as mere investment or "portfolio" income), the taxpayer must receive the income in question from or in connection with an activity of the taxpayer which involves the conduct of a trade or business (or from a pass-through entity in which the taxpayer has an interest which pass-through entity was engaged in the conduct of a trade or business to which the income received by the taxpayer is attributable). If income is received by a taxpayer from a third party's trade or business as a result of some capital or other transaction entered into between the taxpayer and the third-party's business, the income generally will be treated either as capital gain or as investment or portfolio income that will not be eligible to be offset by passive losses. This interpretation of the trade-or-business requirement of section 469 is implicit throughout the statute, regulations, and legislative history. Section 469(e)(1) provides that passive activity income does not include interest, dividend, annuity, or royalty income not derived in the ordinary course of a trade or business. [4] For example, dividend income would normally be received by a taxpayer from a payor *398 engaged in the conduct of a trade or business and if the trade or business of the payor of dividend income satisfied the trade or business requirement, the specific trade or business requirement of section 469(c)(1) would make no sense. Under petitioners' interpretation of section 469, dividend income, for example, would always qualify for passive income treatment because of the trade or business of the payor (assuming, of course, that the taxpayer recipient of the dividend income did not materially participate in the trade or business of the payor). *399 A proper reading of section 469(c)(1)(A) requires that, in order for income to qualify as passive income, the income in question must have been received by the taxpayer in connection with the conduct of his or her trade or business or the conduct of a trade or business of a pass-through entity in which the taxpayer had an ownership interest. The conduct of a trade or business by an unrelated, third-party payor, such as GFS, does not satisfy this requirement. Our reading of the temporary, legislative regulations promulgated by respondent under authority of section 469(c)(6) [5] is consistent with our interpretation of section 469(c)(1) as set forth above. Those regulations provide lengthy and complicated rules applicable to "portfolio" income that is regarded as too passive (i.e., as not relating to the conduct of a trade or business of the taxpayer) to qualify as "passive" income under section 469. See sec. 1.469-2T(c)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988). Those regulations provide generally that income not derived in the ordinary course of a trade or business is not to be treated as "passive" income under section 469(c)(1)(A), *400 but as nonpassive "portfolio" income. See generally Sec. 1.469-2T(c)(1), (3), Temporary Income Tax Regs.
Most portfolio income, as enumerated in the regulations, will be received by taxpayers from third-party payers who generally will be involved in the conduct of their own trades or businesses. If the trades or businesses of third-party payers could be used by recipients of portfolio income to satisfy the trade or business requirement of section 469(c)(1)(A), the trade or business requirement of section 469(c)(1)(A) would effectively be read out of the statute, and most portfolio income described in the regulations would be transformed *401 into "passive" income under the statute. Obviously, such an interpretation of the statute and regulations was not intended. Of further interest to us in this case are the provisions of the temporary regulations that specifically address portfolio income such as interest, annuities, and royalties (including fees and other payments for the use of intangible property). Section 1.469-2T(c)(3), Temporary Income Tax Regs., is explicit in the juxtaposition of passive income received as part of the taxpayer's conduct of a trade or business, on the one hand, with portfolio income received not as part of the taxpayer's conduct of a trade or business, on the other hand. [6]
*402 Similarly, the legislative history of section 469 explains that the reason portfolio income is not treated as passive income is because portfolio income normally produces positive income (due to receipt of portfolio income by the taxpayer generally from independent entities that would be unrelated to a particular taxpayer's passive activities). The Senate report explains as follows: 3. Treatment of portfolio income In general
* * * * Portfolio investments ordinarily give rise to positive income, and are not likely to generate losses which could be applied to shelter other income. Therefore, for purposes of the passive loss rule, portfolio income generally is not treated as derived from a passive activity, but rather is treated like other positive income sources such as salary. To permit portfolio income to be offset by passive losses or credits would create the inequitable result of restricting sheltering by individuals dependent for support on wages or active business income, while permitting sheltering by those whose income is derived from an investment portfolio. [S. Rept. 99-313 (1986), 1986-3 C.B. 713, 728.]
See also, Lipton et al., *403 Passive Activity Losses, 123-138 (1995), which provides a helpful discussion of the differences between passive income and portfolio income. Petitioner's receipt from GFS in 1988, 1989, and 1990 of $ 18,242, $ 18,612, and $ 24,553, respectively, did not occur as part of petitioner's trade or business. Petitioner's trade or business had been sold to GFS in 1986, and the particular trade or business activity that gave rise to the payments to petitioner in 1988, 1989, and 1990 was the activity of GFS, not petitioner, in billing and in collecting payments from patients who had received in those years emergency medical treatment from doctors affiliated with EPI. GFS, after purchasing in 1986 the EPI account from Datamed and from petitioner, continued to engage in the trade or business with respect thereto of billing patients and collecting medical bills. After the sale in 1986, petitioner no longer was involved in any billing and collection business. As such, the payments do not qualify as passive income under section 469. It appears to us that the substance of the transaction between petitioner, Datamed, and GFS constituted a sale and transfer of a capital asset in the form of Datamed's *404 goodwill that had been created by petitioner through Datamed's billing and collection service business. Goodwill has been described as the "privilege that gives a reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers." In re Brown, 150 N.E. 581 (N.Y. 1926); see also Watson v. Commissioner, 35 T.C. 203, 213 (1960). Goodwill has been described by the Supreme Court as "'the expectancy of continued patronage'". Newark Morning Ledger Co. v. United States, 507 U.S.    , 113 S. Ct. 1670, 1675 (1993) (quoting Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962)). If goodwill is sold and if the goodwill was held in a business in which the taxpayer materially participated and such business was conducted through an S corporation, capital gain recognized on the sale would be properly treated as nonpassive income to the taxpayer. Sec. 1.469-2T(c)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711 (Feb. *405 25, 1988). The asset sold by petitioner to GFS appears to fall within the above definition of goodwill. As a result of the Service Agreement, Edelberg and petitioner gave Gottlieb assurances of EPI's continued patronage with GFS, placing GFS in Datamed's previous position vis-a-vis EPI. Gottlieb agreed to pay petitioner for the expectation of EPI's continued patronage. This expectancy was the goodwill that petitioner had developed through her longstanding and continued personal and business relationship with EPI. The transaction giving rise to the income in question appears to constitute the sale by petitioner to GFS of the goodwill associated with the EPI account. In Rev. Rul. 64-235, 1964-2 C.B. 18, respondent stated the following: a number of court decisions indicate that in appropriate factual circumstances a professional practice or other business may possess salable goodwill even though its success is solely attributable to the skill, integrity and other characteristics of the owner. In light of these decisions, the Service will no longer take the position that, as a matter of law, a one-man professional practice or any other *406 one-man business cannot have salable goodwill. * * * [Citations omitted.]
See also Johnson v. Commissioner, 53 T.C. 414 (1969) (sale of general insurance agency business); Brooks v. Commissioner, 36 T.C. 1128 (1961) (sale of orthodontic practice); Meurlin v. Commissioner, 25 T.C. 118 (1955) (sale of medical practice); Horton v. Commissioner, 13 T.C. 143 (1949) (sale of accounting practice); Herndon v. Commissioner, T.C. Memo. 1962-184 (sale of accounting practice), in each of which the sale of goodwill was found to have occurred. Our view of the transaction at issue is not affected by the fact that the Service Agreement was not signed until November 5, 1986, after Datamed's dissolution on October 15, 1986. Datamed was an S corporation through which petitioner conducted her billing and collection service business. As its sole shareholder, petitioner succeeded to all of Datamed's assets on Datamed's liquidation, including its goodwill. See Hopping v. Commissioner, a Memorandum Opinion of this Court dated June 20, 1947 (goodwill *407 passed to shareholders on liquidation of corporation). Because of the personal nature of petitioner's business and the continuing relationship she had with EPI, the goodwill was not extinguished on Datamed's dissolution. Had petitioner not entered into the Service Agreement with GFS, she could have used this goodwill to start a new billing and collection service business. We also note that even if Datamed, not petitioner, were regarded as the actual seller of the goodwill, the income petitioner received from GFS would still appear to represent gain realized by petitioner from a nonpassive activity. See Commissioner v. Court Holding Co., 324 U.S. 331 (1945) (sale of asset by shareholder after liquidation deemed sale by corporation). Any gain recognized by Datamed, as an S corporation, would be passed through to and recognized by petitioner, Datamed's sole shareholder. Sec. 1366. Because petitioner materially participated in Datamed's business during the year the EPI client account was transferred, the gain would be treated as not from a passive activity. Sec. 1.469-2T(c)(2)(i)(A)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711 *408 (Feb. 25, 1988). Because the goodwill petitioner sold to GFS was created through petitioner's billing and collection service business, which was conducted through an S corporation in which petitioner materially participated, the gain realized on its sale would be treated as nonpassive income. Sec. 1.469-2T(c)(2), (7), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5716 (Feb. 25, 1988). We hold that the income petitioner received from GFS pursuant to the Service Agreement constituted income from a nonpassive activity. Decision will be entered under Rule 155. Footnotes
1. Sec. 469(c)(1) provides as follows: In general. -- The term "passive activity" means any activity -- (A) which involves the conduct of any trade or business, and (B) in which the taxpayer does not materially participate.↩
2. Sec. 469(e)(3) provides as follows: Compensation for personal services. -- Earned income (within the meaning of section 911(d)(2)(A)) shall not be taken into account in computing the income or loss from a passive activity for any taxable year.↩
3. We note that respondent, on this issue, did not rely on or cite sec. 1.469-2T(c)(4)(i)(F), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5715↩ (Feb. 25, 1988), with regard to respondent's broad regulatory authority to characterize income as income for personal services. We also decline to rely on that provision in addressing this issue.
4. Sec. 469(e)(1)(A)(i) and (ii) provide as follows: (e) Special Rules for Determining Income or Loss from a Passive Activity. -- For purposes of this section -- (1) Certain income not treated as income from passive activity. -- In determining the income or loss from any activity -- (A) In general. -- There shall not be taken into account -- (i) any -- (I) gross income from interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business, (II) expenses (other than interest) which are clearly and directly allocable to such gross income, and (III) interest expense properly allocable to such gross income, (ii) gain or loss not derived in the ordinary course of a trade or business which is attributable to the disposition of property -- (I) producing income of a type described in clause (i), or (II) held for investment.↩
For purposes of clause (ii), any interest in a passive activity shall not be treated as property held for investment. [Emphasis added.]
5. Sec. 469(c)(6) provides as follows: Activity in connection with trade or business or production of income. -- To the extent provided in regulations, for purposes of paragraph (1)(A), the term "trade or business" includes -- (A) any activity in connection with a trade or business, or (B) any activity with respect to which expenses are allowable as a deduction under section 212.↩
6. Sec. 1.469-2T(c)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), provides as follows: In general. Passive activity gross income does not include portfolio income. For purposes of the preceding sentence, portfolio income includes all gross income, other than income derived in the ordinary course of a trade or business (within the meaning of paragraph (c)(3)(ii) of this section), that is attributable to -- (A) Interest (including amounts treated as interest under paragraph (e)(2)(ii) of this section, relating to certain payments to partners for the use of capital); annuities; royalties (including fees and other payments for the use of intangible property); dividends on C corporation stock; and income (including dividends) * * *; (B) Dividends on S corporation stock (within the meaning of section 1368(c)(2)); (C) The disposition of property that produces income of a type described in paragraph (c)(3)(i)(A) of this section; and (D) The disposition of property held for investment (within the meaning of section 163(d)).↩