WILLIAM H. SCHAEFER, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6555–94.      Filed September 13, 1995.

*Allen L. Schwait,* for petitioner.
*Helen F. Rogers,* for respondent.

OPINION

RAUM, *Judge*: The Commissioner determined deficiencies in petitioner's income taxes totaling $8,688, $55,383, and $11,461 for the years 1988, 1989, and 1990, respectively. Following concessions by petitioner, the sole issue before us is whether income received pursuant to a covenant not to compete is passive income for purposes of section 469.[1] More specifically at issue is the validity of section 1.469–2T(c)(7)(iv), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5716 (Feb. 25, 1988), which, if valid, would without dispute require a decision against petitioner.

Petitioner, William H. Schaefer, Jr., resided in Baltimore, Maryland, at the time the petition in this case was filed. For a period of time prior to November 7, 1984, he was the sole shareholder of Schaefer/May Motor Sales, Ltd. (known as, and hereinafter referred to as, Toyota City), a Maryland corporation engaged in the sale and servicing of Toyota motor vehicles and parts in Glen Burnie, Maryland. On November 7, 1984, all of the assets of Toyota City were sold to an unrelated third party.

---

55 T.C. 138, 142 (1970).

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

The sale agreement included a covenant not to compete with the buyer (referred to sometimes hereinafter simply as the covenant). Schaefer agreed in the covenant that for 3 years he would "not directly or indirectly own, manage, operate, join, control or participate in the ownership, management, operation or control of or be concerned in any manner with any business engaged in the sales or service of Honda or Toyota motor vehicles within a radius of five (5) miles of 5808 Ritchie Highway, Glen Burnie, Maryland [the address of the purchaser's place of business, apparently a Honda dealership]." The address of Toyota City was 7167 Ritchie Highway, Glen Burnie, Maryland. Since the date of the sale of Toyota City, petitioner has not actually rendered any service whatsoever that relates in any way to the sale or service of Toyota or Honda automobiles.

Payments under the covenant were to be made on a monthly basis over a period of 150 months, scheduled to commence 6 months after November 7, 1984, the closing of the sale of Toyota City. The first six payments were in the amount of $7,500 each, and the following 144 payments were in the amount of $10,100 each.[2] Thus, although the covenant not to compete covered a period of only 3 years from the sale of Toyota City, the 150 monthly payments, which were to begin 6 months after the sale, would continue for 13 years after the sale. The covenant stated that it was entered into "to compensate Schaefer for Schaefer's agreement not to compete against the [purchaser] Corporation under the terms and conditions hereinafter set forth."

Petitioner reported the payments under the covenant as passive income on his 1988, 1989, and 1990 income tax returns. Each of these returns included a Form 8275, Disclosure Statement Under Section 6661, stating that petitioner was taking a position contrary to Treasury Department regulations and providing petitioner's reason for doing so.

For the years at issue, petitioner remained the 99-percent shareholder in Nationwide Motor Sales Corp. (Nationwide). Nationwide's principal business was the sale and servicing of

---

[2] It may be interesting to note that although the sale price for the entire Toyota City was $1,060,000 plus an amount to be agreed upon for the new car inventory and the purchaser undertook to assume the burdens of a lease that was not to expire until some 9 years later, the aggregate amount of the monthly payments by the purchaser for the covenant not to compete was $1,499,400.

Nissan, Saab, Isuzu, and AMC/Jeep/Renault automobiles in Timonium, Maryland. The parties stipulated that at no time did Toyota City and Nationwide share staff, keep common bank accounts, file common tax returns, share sources of credit, or do business with common manufacturers, distributors, advertisers, or each other. They further stipulated that petitioner has treated Toyota City and Nationwide as separate business activities at all times and in all respects.

Under the provisions of section 469, a taxpayer's right to make use of passive activity losses in any year is limited to the amount of the taxpayer's passive activity income for that year. Sec. 469(a), (d)(1). Amounts disallowed may be carried forward to subsequent years. Sec. 469(b). While it has been stated that "Issues arising under section 469 typically focus on whether a *loss* is to be properly characterized as a 'passive' loss so that the taxpayer may utilize the loss to offset what the taxpayer and respondent agree is passive income", *Edelberg v. Commissioner,* T.C. Memo. 1995–386, the issue here as in *Edelberg* is whether the taxpayer's *income* is passive so that it may be offset by the taxpayer's passive losses.

Section 1.469–2T(c)(7)(iv), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5716 (Feb. 25, 1988),[3] provides that passive activity gross income does not include "Gross income of an individual from a covenant by such individual not to compete". The result of this provision is that income from a covenant not to compete may not be offset by passive losses. Sec. 469(a), (d)(1). Petitioner argues that this regulation is invalid. We hold otherwise.

We begin by noting that a temporary regulation is entitled to the same weight as a final regulation. *Peterson Marital Trust v. Commissioner,* 102 T.C. 790, 797 (1994); *Truck & Equip. Corp. v. Commissioner,* 98 T.C. 141, 149 (1992); *Nissho Iwai Am. Corp. v. Commissioner,* 89 T.C. 765, 776 (1987). Temporary regulations have binding effect. *LeCroy Research Sys. Corp. v. Commissioner,* 751 F.2d 123, 127 (2d Cir. 1984), revg. on other grounds T.C. Memo. 1984–145. The validity of a temporary regulation is, therefore, judged using the same analysis as would be applied to a final regulation.

---

[3] This temporary regulation is applicable to the years at issue. See sec. 1.469–11(a), Income Tax Regs.

Treasury regulations are entitled to a high degree of deference from the courts. A Treasury regulation must be upheld if it "[implements] the congressional mandate in some reasonable manner". *National Muffler Dealers Association v. United States,* 440 U.S. 472, 476–477 (1979) (quoting *United States v. Correll,* 389 U.S. 299, 307 (1967)). Put differently, Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes". *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948). Indeed, the Supreme Court has stated that the issue is not how the Court itself might construe the statute in the first instance, "but whether there is any reasonable basis for the resolution embodied in the Commissioner's Regulation." *Fulman v. United States,* 434 U.S. 528, 536 (1978). Our conclusion, hereinafter reached, is that section 1.469–2T(c)(7)(iv), Temporary Income Tax Regs., *supra,* fairly implements the congressional purpose underlying section 469 and is a valid regulation.

Section 469 represents the congressional response to the widespread use of tax shelters by some taxpayers to avoid paying tax on unrelated income. See Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 209–210 (J. Comm. Print 1987). Section 469 provides, as explained above, that passive losses will be allowed only to the extent of passive income.

However, certain types of income are specifically excluded from the computation of passive income. These include so-called portfolio income, namely, interest, dividends, annuities, or royalties, as well as gain attributable to the disposition of property, and earned income. Sec. 469(e).[4] Further,

---

[4] Sec. 469(e) provides in part as follows:

SEC. 469(e). SPECIAL RULES FOR DETERMINING INCOME OR LOSS FROM A PASSIVE ACTIVITY.— For purposes of this section—

    (1) CERTAIN INCOME NOT TREATED AS INCOME FROM PASSIVE ACTIVITY.—In determining the income or loss from any activity—

        (A) IN GENERAL.—There shall not be taken into account—

            (i) any—

                (I) gross income from interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business,

          \*        \*        \*        \*        \*        \*        \*

            (ii) gain or loss not derived in the ordinary course of a trade or business which is attributable to the disposition of property—

                (II) producing income of a type described in clause (i), or(II) held for investment.

For purposes of clause (ii), any interest in a passive activity shall not be treated as property held for investment.

the Secretary is specifically instructed to issue regulations "which provide that certain items of gross income will not be taken into account in determining income or loss from any activity". Sec. 469(l)(2).[5]

Congress included these exceptions because these income sources "generally are positive income sources that do not bear deductible expenses to the same extent as passive investments. Since taxpayers commonly can rely upon salary and portfolio income to be positive * * * they are susceptible to sheltering by means of investments in activities that predictably give rise to tax losses". Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 215 (J. Comm. Print 1987). It is with this understanding of the purpose behind section 469, and the specific types of income Congress meant to ensure were not sheltered by losses from passive activities, that we examine section 1.469–2T(c)(7)(iv), Temporary Income Tax Regs., *supra.*

The covenant not to compete provided petitioner with a steady stream of income payments for a comparatively long number of years *after* the expiration of the 3-year period covered by his covenant not to compete. Income from the covenant was certainly positive, gave rise to taxable income, and did not bear any deductible expense. Petitioner, as long as he performed during the 3-year period under the covenant, was subject only to the credit risk of the payor. In these important ways, income from the covenant is indistinguishable from either portfolio income or earned income.

It is so well established as to not require citation that income from a valid covenant not to compete is ordinary income. However, in the context of determining whether this income is passive income or not, it is instructive to review generally exactly why it has been decided that income from a covenant not to compete is ordinary income.

In *Cox v. Helvering,* 71 F.2d 987 (D.C. Cir. 1934), the Court of Appeals had to decide whether a payment under a

---

* * * * * * *

(3) COMPENSATION FOR PERSONAL SERVICES.—Earned income (within the meaning of section 911(d)(2)(A)) shall not be taken into account in computing the income or loss from a passive activity for any taxable year.

[5] This specific grant of authority qualifies the regulation at issue as a so-called legislative regulation, which may be entitled to even greater weight than a regulation issued under the Secretary's general authority found in sec. 7805. See *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981).

covenant not to compete was ordinary income. The Court compared the payment favorably with earned income. It stated that "If * * * [the taxpayer] sells his services for wages or salary, what he receives is income. If he refrains from exercising his skill and ability in a particular line for a definite period, what he receives in compensation in the common understanding is just as much a gain and is income." *Id.* at 988; see also *Salvage v. Commissioner,* 76 F.2d 112, 113 (2d Cir. 1935) (compensation paid for refraining from labor would seem to be taxable income no less than compensation for services to be performed), affd. *Helvering v. Salvage,* 297 U.S. 106 (1936).

Similarly, this Court has stated that "Importance from the standpoint of the vendor, of course, lies in the treatment of his negative covenant as *the equivalent of affirmative personal services* and hence taxation of it proceeds as ordinary income under section 22(a)." *Ullman v. Commissioner,* 29 T.C. 129, 139 (1957) (emphasis added), affd. 264 F.2d 305 (2d Cir. 1959); see also *Estate of Beals v. Commissioner,* 31 B.T.A. 966, 971 (1934), affd. 82 F.2d 268 (2d Cir. 1936) (payment under covenant not to compete is compensation for refraining from exercising right to engage in business).

These cases are cited to show the long history of viewing payments under a covenant not to compete as similar to types of income *specifically* excluded from passive income by Congress itself under section 469(e)(3). In view of this history, the regulation at issue cannot be held unreasonable or contrary to Congress's intent.

The validity of a regulation is judged under a standard of reasonableness. *National Muffler Dealers Association v. United States,* 440 U.S. 472 (1979); *Commissioner v. South Texas Lumber Co.,* 333 U.S. at 501 (1948). As shown above, income from a covenant not to compete has been viewed for many years as analogous to compensation for services. We conclude that the regulation under attack is clearly valid.

Petitioner argues that the covenant not to compete income is sufficiently different from earned income or portfolio income to render invalid section 1.469–2T(c)(7)(iv), Temporary Income Tax Regs., *supra.* As our discussion above should make clear, we do not agree.

Petitioner argues that compensation under a covenant not to compete is the polar opposite of earned income, because

the point of a covenant not to compete is that services will *not* be rendered. And he contends that his position is supported by section 911(d)(2)(A), which is made applicable by section 469(e)(3), *supra* note 4. Section 911(d)(2)(A) defines earned income as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered". Petitioner focuses upon the words "compensation for personal services actually rendered".

Petitioner's point is superficially persuasive, but reflection will disclose that it is fallacious. It is fallacious because petitioner assumes that "services actually rendered" must involve some positive action, rather than affirmatively refraining from doing something. And it is that personal deliberate failure to act that the purchaser has bargained for in this case. Such personal refraining to engage in competition traditionally has been equated in the tax law with the rendition of personal services. We quote again what we have quoted above from *Ullman v. Commissioner,* 29 T.C. at 139, as to the justification for treating the "negative covenant as the equivalent of affirmative personal services". At most, the interpretation of the statutory language "personal services actually rendered" is open to differing interpretations—precisely the kind of situation that is appropriate for a regulation to resolve. See *Fulman v. United States,* 434 U.S. at 536.

Petitioner also points out that income from the covenant is not interest, dividend, annuity, or royalty income, which are dealt with in section 469(e)(1)(A)(i). This is certainly true. However, again, these serve as specific examples of the *type* of income Congress meant to exclude.

The fact that income from the covenant is not exactly the same as any of the specific examples used by Congress is well documented by petitioner. But petitioner attempts to set too narrow a standard. If the regulations were to be limited to income that falls squarely within an example used by Congress, then there would be no need for the regulations. Petitioner's argument proves too much.

Finally, petitioner contends that the grant of authority under section 469(l)(2) cannot be read so broadly as to support this regulation. To do so, according to petitioner, would mean that Congress provided no intelligible standard for the Secretary in violation of the constitutionally required separation of powers. See *Mistretta v. United States,* 488 U.S. 361

(1989). That is certainly not the case here. Our analysis requires that the regulation conform to congressional intent, and the Secretary has done so.

Petitioner has made other arguments. We have considered them and find them to be without merit.

*Decision will be entered for respondent.*

