115 T.C. No. 9

UNITED STATES TAX COURT

HOWARD V. MORE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4455-99.                    Filed August 15, 2000.

     P is an individual underwriter for Lloyd's of
London (Lloyd's).  As an underwriter, P is required to
demonstrate that he can cover potential losses on the
policies that he underwrites, a.k.a., show means.  In
order to show means, P posted a letter of credit issued
by Bank Julius Baer (BJB) with Lloyd's.  The letter of
credit was secured by P's preexisting stock portfolio.

     The policies that P underwrote for the taxable
years 1992 and 1993 incurred losses.  As a result of
the losses, BJB sold P's stock at a substantial gain
during those years.

     P reported the losses from his underwriting
activities as passive losses on his 1992 and 1993
Federal income tax returns.  Additionally, P reported
the gain from the sale of stock by BJB as passive
income.  P then offset the gain with the passive
losses.  R contends that the gain recognized on the
sale of stock is portfolio income, and portfolio income
cannot be offset by P's passive losses.

Held:  The gain from the sale of stock is portfolio income pursuant to sec. 469(e)(1)(A), I.R.C., and sec. 1.469-2T(c)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), and cannot be offset by P's passive losses.

Martha A. Roof, for petitioner.

Louis B. Jack, for respondent.


OPINION

VASQUEZ, Judge:  In the notice of deficiency, respondent determined deficiencies of $38,145 and $79,812 in petitioner's Federal income taxes for 1992 and 1993, respectively.  After concessions, the issue for decision is whether gain from the sale of stock pledged as collateral for a letter of credit which guaranteed petitioner's underwriting activities is portfolio income.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

The parties submitted this case fully stipulated.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  At the time the petition was filed, petitioner resided in Pasadena, California.

General Background on Underwriting for Lloyd's

Lloyd's of London's (Lloyd's) business consists of insuring

and reinsuring worldwide risks.[1]  Like insurance companies, Lloyd's generates income from the underwriting of insurance risks and from the investment of premiums received on the insurance policies underwritten.  Generally, the underwriting component generates losses, while the investment component generates profits.

Lloyd's is organized into numerous entities referred to as syndicates.  Syndicates are composed of individual and corporate members (Names) and controlled by managing agents.  Names provide the financial backing behind Lloyd's policies.   From the mid-1970's until the years in issue, petitioner was a Name for Lloyd's.

The managing agents of the syndicates select policies to underwrite from the Lloyd's trading floor in the same fashion as a mutual fund manager acquires stock for a mutual fund.  A managing agent may decide to underwrite any percentage of the risk of any Lloyd's policy that he/she wishes.  For example, a managing agent may choose to underwrite 10 percent of the risk on an aviation policy and leave the other 90 percent of the risk to be underwritten by other syndicates.

Each year, Names choose the syndicates in which they wish to participate.  To limit their risk, Names usually participate in

---

[1]  Lloyd's is not an insurance company but a competitive market where risks are undertaken by syndicates and their members.

many syndicates.  Names agree to accept a predetermined percentage of all risks underwritten on behalf of the syndicates. Where total insurance claims are less than the premiums collected plus investment income, Names make a profit commensurate with the percentage that they agreed to underwrite.  However, where claims exceed premiums collected plus investment income, Names must cover their percentage of the loss.

Names have a certain capacity of premiums that they can underwrite for a given year.  A Name's usual capacity is from £200,000 to £2 million.  In order to be accepted by Lloyd's, a Name must demonstrate his/her ability to cover potential losses, a.k.a., "show means".  A Name generally may show means by posting cash, assets, or a letter of credit equal to at least 30 percent of his/her underwriting capacity with Lloyd's.

Petitioner's Underwriting Activities

Beginning in the 1960's, petitioner invested in stock.  In 1988, to secure a letter of credit, petitioner transferred his stock portfolio (pledged stock) to a brokerage account at Bank Julius Baer (BJB), a London-based bank.

During 1992 and 1993, petitioner underwrote £500,000 of Lloyd's premiums which were secured by a letter of credit from BJB in the amount of £150,000.

During those years, a number of the syndicates in which petitioner participated incurred losses.  In order to cover those

losses, BJB sold petitioner's pledged stock.[2]  From these sales of the pledged stock, he realized substantial gains during 1992 and 1993.

Lloyd's Closing Agreement and Filing Procedure

In 1990, in an effort to provide uniform tax treatment to United States and non-United States underwriters of Lloyd's, the underwriters, Lloyd's, and the IRS entered into a closing agreement.  The closing agreement bound all United States Names, including petitioner, to report all underwriting profits and losses and all investment income from Lloyd's activities as income or loss from a passive activity.  Thus, pursuant to the closing agreement, petitioner treated the losses incurred by the syndicates in which he participated as passive losses.  The closing agreement did not address the tax treatment of gains or losses realized on the disposition of assets held as security for a letter of credit provided for the underwriting activities.

## Discussion

On his 1992 and 1993 tax returns, petitioner reported the gain from the sale of the pledged stock as passive income and offset the gain by the passive losses from his underwriting activities.  Respondent disagrees with this treatment and argues that the gain is portfolio income which cannot be offset by

---

[2]  We assume that Lloyd's drew upon petitioner's letter of credit thereby precipitating the sale of petitioner's pledged stock by BJB.

passive losses.

General Background on the Passive Loss Rules

The section 469 passive loss rules were enacted as part of the Tax Reform Act of 1986 (TRA '86), Pub. L. 99-514, 100 Stat. 2085, in response to the Congressional belief that "decisive action * * * [was] needed to curb the expansion of tax sheltering".  S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 713, 714.  Those rules were specifically designed to prevent a taxpayer from using losses from a passive activity to offset unrelated income generated in a nonpassive activity.  See Hillman v. Commissioner, 114 T.C. 103, 107 (2000).

A passive activity is defined as a trade or business in which the taxpayer does not materially participate.  See sec. 469(c)(1).  Section 469 generally disallows a taxpayer's passive activity loss or credit.  See sec. 469(a).  A taxpayer's passive activity loss is the amount by which the aggregate losses from all passive activities for the taxable year exceed the aggregate gains from all passive activities for such year.  See sec. 469(d)(1).

Income from passive activities, i.e., passive activity gross income, includes an item of gross income if and only if such income is from a passive activity.  See sec. 1.469-2T(c)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711 (Feb. 25, 1988).  In determining how to treat the gain from the disposition

of property used in an activity, the regulations generally provide that (1) the gain is treated as gross income from such activity; (2) if the activity is a passive activity of the taxpayer for the year of the disposition, the gain is treated as passive activity gross income; and (3) if the activity is not a passive activity of the taxpayer for the year of the disposition, the gain is treated as not from a passive activity. See sec. 1.469-2T(c)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711-5712 (Feb. 25, 1988).

The Secretary promulgated a separate rule for substantially appreciated property.[3] Where property used in an activity is substantially appreciated at the time of its disposition, any gain from the disposition will be treated as not from a passive activity unless the property was used in a passive activity for either (1) 20 percent of the period during which the taxpayer held the property or (2) the entire 24-month period ending on the date of the disposition. See sec. 1.469-2(c)(2)(iii)(A), Income Tax Regs.[4] The Secretary added this rule to dissuade taxpayers

---

[3] Substantially appreciated property is defined as property with a fair market value which exceeds 120 percent of the property's adjusted basis. See sec. 1.469-2(c)(2)(iii)(C), Income Tax Regs.

[4] We note that sec. 1.469-2(c)(2)(iii), Income Tax Regs., was first introduced in temporary form in 1988 as sec. 1.469-2T(c)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711-5712 (Feb. 25, 1988). In 1989, the Secretary amended slightly the temporary regulation. See sec. 1.469-2T(c)(2)(iii),
(continued...)

from structuring dispositions in a manner that would generate passive activity gross income in inappropriate situations. See T.D. 8175, 1988-1 C.B. 191, 196. Without this exception, a taxpayer could transfer substantially appreciated property used in a nonpassive activity to a passive activity just prior to disposition, thereby converting nonpassive gain into passive gain to be offset by passive losses.

Section 469(e)(1)(A) and the applicable regulations thereunder provide that certain income will not be treated as income from a passive activity including (1) any gross income from interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business, and (2) any gain or loss not derived in the ordinary course of a trade or business which is attributable to the disposition of property producing income of a type described in (1) or property held for investment (the portfolio income exception). The temporary regulations refer to this type of income as portfolio income. See sec. 1.469-2T(c)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988); see also Schaefer v. Commissioner, 105 T.C. 227, 230 (1995).

The legislative history sheds some light on why Congress

---

[4](...continued)
Temporary Income Tax Regs., 54 Fed. Reg. 20527, 20538 (May 12, 1989). In 1992, the temporary regulation was finalized without change. See sec. 1.469-2(c)(2)(iii), Income Tax Regs., 57 Fed. Reg. 20747, 20754 (May 15, 1992); T.D. 8417, 1992-1 C.B. 173, 181-183.

excluded portfolio income from the passive loss rules:

> Portfolio investments ordinarily give rise to positive income, and are not likely to generate losses which could be applied to shelter other income.  Therefore, for purposes of the passive loss rule, portfolio income generally is not treated as derived from a passive activity, but rather is treated like other positive income sources such as salary.  To permit portfolio income to be offset by passive losses or credits would create the inequitable result of restricting sheltering by individuals dependent for support on wages or active business income, while permitting sheltering by those whose income is derived from an investment portfolio. [S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 728.]

Income of a type generally regarded as portfolio income which is derived in the ordinary course of a trade or business does not fall within the definition of portfolio income.  See sec. 469(e)(1)(A); sec. 1.469-2T(c)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988).  Congress and the Secretary reasoned that "the rationale for treating portfolio-type income as not from the passive activity does not apply [in these instances], since deriving such income is what the business activity actually, in whole or in part, involves."  S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 729.  For example, banks derive a large majority of their business income from interest. See id.  Under this rule, the bank would not treat the interest as portfolio income.  See id.

Parties' Arguments

Petitioner claims that his gain is attributable to the disposition of substantially appreciated property used in a passive activity (his underwriting activity) for more than 20

percent of the period during which he held the interest in the property. Petitioner therefore argues that the gain is passive income under section 1.469-2T(c)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5711-5712 (Feb. 25, 1988), and section 1.469-2(c)(2)(iii), Income Tax Regs.

Respondent argues that petitioner's gain is attributable to the disposition of dividend-producing property which was not derived in the ordinary course of a trade or business. Respondent therefore contends that the gain on the sale of the pledged stock is portfolio income under section 469(e)(1)(A) and section 1.469-2T(c)(3)(i)(C), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988).

Which Rule Applies?

In order to understand how the rules relied on by the parties interrelate and decide which rule controls in the present case, we look at the general structure of section 469 and the applicable regulations thereunder. The regulation relied on by petitioner, i.e., section 1.469-2(c)(2)(iii), Income Tax Regs., is part of the general rules defining passive activity gross income under section 469. The Internal Revenue Code section and regulation relied on by respondent, i.e., section 469(e)(1)(A) and section 1.469-2T(c)(3)(i)(C), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), except from those general rules a disposition of property of a type that produces portfolio income.

We find that the specific exception for a disposition of property that produces portfolio income takes precedence over the more general rule regarding the treatment of gain from the disposition of property used in an activity. See HCSC-Laundry v. United States, 450 U.S. 1, 6, 8 (1981) (holding that a specific provision takes precedence over a general one). When a disposition is of property that generates portfolio-type income, the more specific provisions regarding the disposition of such property should apply in accordance with the Congressional aim behind the portfolio income exception. We therefore apply section 469(e)(1)(A) and section 1.469-2T(c)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), to the present case.

Application of Section 469(e)(1)(A) and Section 1.469-2T(c)(3)

As noted earlier, passive activity gross income does not include portfolio income. See sec. 469(e)(1)(A); sec. 1.469-2T(c)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988). Portfolio income includes: (1) Any gross income from interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business, and (2) any gain or loss not derived in the ordinary course of a trade or business which is attributable to the disposition of property producing income of a type described in (1) or property held for investment. See id.

The regulations provide for this purpose a narrow definition

of "gross income derived in the ordinary course of a trade or business". Sec. 1.469-2T(c)(3)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988). The regulations provide an exhaustive list of seven sources of income that satisfy the definition and, as a result, will not be considered portfolio income.[5] See id. The source pertinent to our discussion is

_____

[5] Sec. 1.469-2T(c)(3)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), provides, in pertinent part:

gross income derived in the ordinary course of a trade or business includes only--

(A) Interest income on loans and investments made in the ordinary course of a trade or business of lending money;

(B) Interest on accounts receivable arising from the performance of services or the sale of property in the ordinary course of a trade or business of performing such services or selling such property, but only if credit is customarily offered to customers of the business;

(C) Income from investments made in the ordinary course of a trade or business of furnishing insurance or annuity contracts or reinsuring risks underwritten by insurance companies;

(D) Income or gain derived in the ordinary course of an activity of trading or dealing in any property if such activity constitutes a trade or business * * *;

(E) Royalties derived by the taxpayer in the ordinary course of a trade or business of licensing intangible property * * *;

(F) Amounts included in the gross income of a patron of a cooperative * * * by reason of any payment or allocation to the patron based on patronage occurring with respect to a trade or business of the

(continued...)

"Income from investments made in the ordinary course of a trade or business of furnishing insurance or annuity contracts or reinsuring risks underwritten by insurance companies" found in subdivision (ii)(C) of section 1.469-2T(c)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5686, 5713 (Feb. 25, 1988), (subdivision (ii)(C)).

Respondent contends that petitioner's gain was not derived in the ordinary course of a trade or business within the meaning of subdivision (ii)(C). On brief, petitioner does not address the application of this regulation.

In light of the restrictive nature of subdivision (ii)(C), we read it narrowly. We look closely at the language contained in the regulation and interpret it according to its ordinary and plain meaning. See FDIC v. Meyer, 510 U.S. 471, 476 (1994); Borregard v. National Transp. Safety Bd., 46 F.3d 944, 945-946 (9th Cir. 1995); ICI Pension Fund v. Commissioner, 112 T.C. 83, 87 (1999).

Subdivision (ii)(C) provides that income from investments made in the ordinary course of a trade or business of reinsuring risks underwritten by insurance companies constitutes "gross

---

[5](...continued)
patron; and

    (G) Other income identified by the Commissioner as income derived by the taxpayer in the ordinary course of a trade or business.

income derived in the ordinary course of a trade or business" and is, thus, not portfolio income. According to its plain meaning, we believe that the phrase "made in the ordinary course of a trade or business" contemplates not only that the investment occur at a time when the taxpayer is conducting a trade or business of reinsuring risks but also contemplates that the investment be an ordinary and necessary part of the business of reinsuring risks.

Additionally, we interpret subdivision (ii)(C) in light of the workings of the insurance industry. Like insurance companies, Lloyd's generates income from the underwriting of insurance risks and from the investment of premiums received on the insurance policies underwritten. The underwriting component generally generates losses, while the investment component generates profits. While the income generated by the investment component of a reinsurance business would otherwise be considered portfolio income, we believe that under subdivision (ii)(C), if this income is derived in the ordinary course of a trade or business of reinsuring risks, it is excluded from the definition of portfolio income. Insofar as this income is considered to be part and parcel of the business activity of reinsuring risks, the income is not characterized as portfolio income.

It is unclear from the record whether petitioner acquired all of the pledged stock before his underwriting activities began. We note that at least some of the pledged stock was

acquired as early as 1960, and petitioner did not begin underwriting until the mid-1970's. Petitioner has not shown that acquisition of any of the pledged stock was an ordinary and necessary part of his underwriting activities. The evidence indicates instead that petitioner acquired the pledged stock as an investment. He merely pledged this investment asset to secure the letter of credit that he needed for his underwriting activities. The pledging of the stock did not convert petitioner's investment asset to an asset used in a trade or business of underwriting. We do not find that petitioner's acquisition of the pledged stock was "made in the ordinary course of a trade or business" as contemplated by subdivision (ii)(C).

Further, we believe petitioner's gain is not the typical type of income recognized by insurance companies or reinsurers on their investment of insurance premiums. There is no evidence that petitioner acquired the pledged stock with the premiums of the policies underwritten. Nor does the record show that the gain from the disposition of the pledged stock was committed to his underwriting activities and not spent for personal purposes such as living expenses. Consequently, we do not believe that subdivision (ii)(C) was meant to encompass petitioner's gain.

We also draw an analogy between petitioner's gain and the interest earned on the investment of working capital. Section 469(e)(1)(B) provides that any income, gain, or loss which is attributable to an investment of working capital shall be treated

as not derived in the ordinary course of a trade or business, i.e., it will be treated as portfolio income.  In regard to this section, the report of the Senate Committee on Finance stated: "Although setting aside such amounts may be necessary to the trade or business, earning portfolio income with respect to such amounts is investment-related and not a part of the trade or business itself."  S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 713, 729-730.  We believe that petitioner's gain is no more closely connected to his underwriting activities than would be interest earned on the investment of working capital, and, thus, it should be treated as not derived in the ordinary course of a trade or business.

We conclude that petitioner's gain is portfolio income and that he cannot utilize his passive losses to offset this gain.

Decision will be entered

under Rule 155.