*cert. denied,* 498 U.S. 1029, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991).

Although we hold section 851(e) unconstitutional, we leave the rest of section 851 undisturbed. Therein sentencing courts will find adequately detailed procedures regarding a criminal defendant's challenge to prior convictions, including how to set forth such claims, the burden of proof, waiver, etc. 21 U.S.C. § 851(c). These statutory procedures appear to provide adequate and economical procedures for sentencing courts faced with challenges to prior convictions under this section.

Therefore, we vacate Williams' sentence and we remand for resentencing. At his resentencing Williams may challenge the validity of those prior convictions used to enhance his sentence regardless of when they occurred.

Davis' and Williams' convictions are **AFFIRMED**. We **VACATE** their sentences and **REMAND** to the district court for resentencing.

TROTT, Circuit Judge, concurring in part and dissenting in part.

I concur in Judge Poole's opinion except the part holding 21 U.S.C. § 851(e) unconstitutional. For the reasons given by the Eleventh Circuit in *United States v. Williams,* 954 F.2d 668, 673 (11th Cir.1992), I do not believe it was either unconstitutional or unreasonable for Congress to set a five-year limit on the ability of a recidivist to attack the validity of a dormant prior conviction. Enough is enough. After five years it becomes extremely difficult if not impossible to cope with claims such as what "my attorney told me," "what the judge said," "what I understood," etc. If the matter has come to rest, so be it. Statutes of limitation are an important feature of our legal system.

Settled priors should be able to be used in sentencing criminals whose response to the criminal justice system and to society is to commit another crime. Why do we deem it necessary to bend over backwards to the point of standing on our heads to indulge repeat offenders whose "standing" to reopen closed cases is based on having committed another criminal offense? We should inform such repeat offenders that if when it was ripe to do so they did not succeed in overturning a conviction on appeal or undoing it by way of a petition for a writ of habeas corpus, the reasonable limit on rewriting history is five years.

The ANN JACKSON FAMILY
FOUNDATION, Petitioner–
Appellee,

v.

COMMISSIONER INTERNAL
REVENUE SERVICE,
Respondent–Appellant.

No. 92–70211.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 12, 1993.

Decided Feb. 4, 1994.

**918**

Robert W. Wood, Bancroft & McAlister, San Francisco, California, for petitioner-appellee.

Joan I. Oppenheimer, Tax Division, United States Department of Justice, Washington, D.C., for the respondent-appellant.

Before: REINHARDT and LEAVY, Circuit Judges, and MERHIGE,* District Judge.

---

\* The Honorable Robert R. Merhige, Jr., Senior District Judge for the Eastern District of Virginia, sitting by designation.

1. A split-interest trust is one in which both charitable and non-charitable beneficiaries have interests in the trust corpus and for which the donor-settlor is allowed a tax deduction equal to the value of the charitable interest at the time of the trust's creation. *See* 26 U.S.C. § 4947(a)(2); 4 B. Bittker & L. Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 101.2.6 at 101–38 (2d ed. 1992). In the majority of cases the non-

---

LEAVY, Circuit Judge:

In this case we are called upon to decide whether the Tax Court erred by invalidating a federal income tax regulation on the ground that it was inconsistent with its governing statute. For the reasons which follow, we affirm that decision.

## FACTS AND PRIOR PROCEEDINGS

In December 1978 Ann Gavit Jackson ("Jackson") established The Ann Jackson Family Foundation ("Foundation"), a private, non-operating, tax-exempt entity whose sole function was and is to award grants to charitable organizations. In order to fund the Foundation, Jackson created The Ann Jackson Family Charitable Trust ("Trust") in February 1979. The Trust, a split-interest charitable lead trust,[1] was funded by an initial contribution from Jackson of $5,000,000, for which donation she took a one-time income tax deduction of $4,164,000. The Trust invested this $5,000,000 from which it distributes to the Foundation an amount equal to 7% of the Trust corpus, or some $350,000, per year. The Foundation in turn annually donates at least 5% of its income to various charities and invests the undonated portion.

This Trust–Foundation arrangement will expire after twenty years, at which time any funds remaining in the Trust will be paid over to Jackson's heirs. The Foundation will continue in operation, however, based on the assumption that it will have accumulated enough capital from its twenty years of investing the undonated portions of its annual income to be entirely self-sufficient.

In September 1989 the Internal Revenue Service ("IRS") issued a Notice of Deficiency ("Notice") to the Foundation for tax years

charitable beneficiaries, often the donor-settlor's heirs, take first for a period of time, either life or for a fixed term of years, after which the charitable beneficiaries take the remainder of the trust property. In a split-interest charitable lead trust, however, the charitable beneficiaries take first, after which the non-charitable beneficiaries receive the balance of the trust property. Needless to say, a charitable lead trust is something of a rare bird, since donor-settlors usually want their heirs to enjoy their property before turning it over to a charity.

1983 through 1989, assessing the Foundation with first tier income tax deficiencies under 26 U.S.C. § 4942(a)[2] of $603,651, a second tier income tax deficiency under 26 U.S.C. § 4942(b)[3] of $815,079, and additions to tax (penalties) under 26 U.S.C. § 6651(a)(1)[4] of $150,911. Relying on 26 C.F.R. § 53.-4942(a)–2,[5] the IRS contended that the Trust's original corpus of $5,000,000, and not merely its annual distributions of $350,000, had to be attributed to the Foundation; and, since the Foundation was required by law to donate annually at least 5% of its assets in order to retain its tax-exempt status, *see* 26 U.S.C. § 4942(e),[6] the Foundation was subject to excise taxes because it was not donating an amount equal to at least 5% of $5,000,-000.[7]

The Foundation filed the instant petition with the United States Tax Court ("Tax Court"), arguing that, because the Founda-

tion and Trust were separate and distinct entities, the 5% statutory minimum investment requirement of 26 U.S.C. § 4942(e) applied only to the Foundation's own assets, including the annual $350,000 Trust distribution, but not to the Trust's $5,000,000 original corpus nor to anything else owned or held by the Trust.

The case was tried on stipulated facts. In an opinion authored by Senior Tax Judge Tannenwald, the Tax Court rejected all of the assessed deficiencies and additions to tax, holding that 26 C.F.R. § 53.4942(a)–2(b)(2) was invalid because it was inconsistent with its governing statute, 26 U.S.C. § 4942(e). Judge Tannenwald's decision was reviewed by the full Tax Court and unanimously upheld.[8] *See The Ann Jackson Family Foundation v. C.I.R.*, 97 T.C. 534, 1991 WL 231, 243 (1991) ("*Family Foundation*"). It is from this decision that the IRS has appealed.

---

**2.** "There is hereby imposed on the undistributed income of a private foundation for any taxable year, which has not been distributed before the first day of the second ... taxable year ... a tax equal to 15 percent of the amount of such income remaining undistributed at the beginning of such second ... taxable year." 26 U.S.C. § 4942(a) (in relevant part).

**3.** "In any case in which an initial tax is imposed under subsection (a) on the undistributed income of a private foundation for any taxable year, if any portion of such income remains undistributed at the close of the taxable period, there is hereby imposed a tax equal to 100 percent of the amount remaining undistributed at such time." 26 U.S.C. § 4942(b).

**4.** "In case of failure to file any return ... unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate[.]" 26 U.S.C. § 6651(a)(1) (in relevant part).

**5.** This regulation, which runs to twelve double-columned pages of dense type in the Code of Federal Regulations, is far too lengthy to quote here. However, the relevant portions can be summarized as follows: Paragraph (a) confusingly—and somewhat unhelpfully—defines "undistributed income" (see 26 U.S.C. § 4942) as "the

amount by which [t]he distributable amount ... exceeds [t]he qualifying distributions ... made before such time out of such distributable amount." Paragraph (b) of the same subsection in turn defines "distributable amount" for tax years after December 31, 1981, as "an amount equal to the minimum investment return [generally, 5%] ... reduced by the sum of the taxes imposed on such private foundation for such taxable year [ordinarily, none] ... and increased by the amounts received from trusts described in subparagraph (2) of this paragraph." Subparagraph (2) in turn increases "distributable amount" by adding the income portion of distributions from trusts thereto. It is the meaning of subparagraph (2) that is at issue in this appeal.

**6.** "[T]he minimum investment return for any private foundation for any taxable year is 5 percent of the excess of (A) the aggregate fair market value of all assets of the foundation other than those which are used (or held for use) directly in carrying out the foundation's exempt purpose, over (B) the acquisition indebtedness with respect to such assets (determined under [26 U.S.C. §] 514(c)(1) without regard to the taxable year in which the indebtedness was incurred)." 26 U.S.C. § 4942(e)(1).

**7.** *But see* note 12, *infra.*

**8.** Of the nineteen judges then on active service with the Tax Court, three—Judges Parker, Hamblen, and Ruwe—were unavailable to review Judge Tannenwald's decision, and Judge Jacobs did not participate. The other fifteen, including then Chief Judge Nims, unanimously concurred

## ANALYSIS

### Standard of Review

Because the underlying facts are not in dispute, the only question before us is one of law. We review the Tax Court's legal conclusions de novo. See Walt Disney, Inc. v. C.I.R., 4 F.3d 735, 738 (9th Cir.1993).[9]

### Discussion

#### I

The IRS first argues that we should not overturn 26 C.F.R. § 53.4942(a)–2 because it was duly promulgated by the agency charged with applying and interpreting our nation's tax laws and is of long-standing duration. We reject this argument.

■ Interpretive regulations, like the one involved here, are promulgated under the IRS's authority to "prescribe all needful rules and regulations[.]" 26 U.S.C. § 7805(a); Pacific First Fed. Savs. Bank v. C.I.R., 961 F.2d 800, 803 (9th Cir.), cert. denied, — U.S. —, 113 S.Ct. 209, 121 L.Ed.2d 150 (1992). Such regulations, however, are entitled to less judicial deference than are those issued pursuant to a specific grant of authority. United States v. Vogel Fertilizer Co., 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982); L & F Int'l Sales Corp. v. United States, 912 F.2d 377, 380 n. 2 (9th Cir.1990); Cameron v. C.I.R., 98 T.C.

123, 125, 1992 WL 17458 (1992). As the Tax Court recently noted,

> [A]lthough regulations are entitled to considerable weight, the Secretary may not usurp the authority of Congress by adding restrictions to a statute which are not there. A regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language of the statute, its origin, and its purpose.

Nalle v. C.I.R., 99 T.C. 187, 191, 1992 WL 184967 (1992) (internal citations omitted). Accordingly, the mere fact that the interpretive regulation in the instant appeal was issued by the Secretary of the Treasury some twenty years ago is no argument against either the Tax Court's overturning that regulation or our upholding that ruling if the regulation fails to "implement the congressional mandate in some reasonable manner." Pacific, 961 F.2d at 803 (quoting National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979)).

#### II

■ Congress perceived a problem back in 1969 involving tax-motivated investments being made in non-productive assets. In an effort to encourage more income-producing investment, Congress passed the Tax Reform Act of 1969 ("1969 Act"), Pub.L. No. 91–172,

---

with the analysis and result of Judge Tannenwald's opinion.

9. The parties agree that our review is de novo but disagree on whether we should grant any degree of deference to the Tax Court's opinion. In the light of our holding, we need not resolve this dispute. Nevertheless, we recently noted that [i]n the past, there has been some ambiguity in our circuit over the proper scope of review of tax court decisions. The parties have stipulated to the facts in this case. Therefore, we are only faced with a question of law concerning the validity of the regulation, which we review de novo. Some of our earlier decisions, however, appear to indicate that deference should be given to decisions of the tax court. In Vukasovich, Inc. v. Commissioner, 790 F.2d 1409, 1411–13 (9th Cir.1986), we recognized the difficulty with some of our previous decisions and concluded that, in general, no special deference should be given the tax court when reviewing a pure question of law. Pacific First Fed. Savs. Bank v. C.I.R., 961 F.2d 800, 803 (9th Cir.) ("Pacific") (some citations

omitted), cert. denied, — U.S. —, 113 S.Ct. 209, 121 L.Ed.2d 150 (1992).

We have never held that Tax Court decisions are not entitled to any deference, no matter what the circumstances. In Pacific, supra, we stated only that the Tax Court's decision was not entitled to any special deference because the interest of national uniformity in federal tax law was not present, since "the tax court decision has been thoroughly considered and rejected by another circuit[.]" Id. at 803. This case differs from Pacific in several respects. The interest of national uniformity is present here, since no other circuit has yet faced the legal question raised. Moreover, the instant appeal involves the review of a unanimous decision of the Tax Court, while the decision in Pacific, itself a split decision, involved the review of a Tax Court decision in which five judges dissented. See Pacific First Fed. Savs. Bank v. C.I.R., 94 T.C. 101, 107, 1990 WL 16898 (1990). Finally, this case turns on an extremely narrow and complex question of tax law peculiarly within the ken of the Tax Court's expertise.

83 Stat. 502 (1969). Section 101(b) of the 1969 Act, since codified (in part) as 26 U.S.C. § 4942, imposes an excise tax on a private foundation's undistributed income, defined as the excess of "distributable amount" over "qualifying distributions". 26 U.S.C. § 4942(c). "Distributable amount" is in turn defined as an amount equal to "the sum of the minimum investment return" (generally pegged at 5% of the fair market value of the foundation's assets) plus certain other items not here relevant.[10] 26 U.S.C. § 4942(d)(1); *Family Foundation,* 97 T.C. at 538–39.

In 1971 the Secretary of the Treasury proposed a regulation designed to implement the provisions of section 4942 noted above. That regulation, with some modifications, became 26 C.F.R. § 53.4942(a)–2 two years later.

By 1981 Congress was becoming increasingly concerned about the ravages of inflation and the resultant investment strategies of tax-exempt foundations and trusts. Accordingly, Congress amended 26 U.S.C. § 4942 by way of section 823 of the Economic Recovery Tax Act of 1981 ("ERTA"), Pub.L. No. 97–34, 95 Stat. 351 (1981). That section eliminated the dual distribution requirement of 26 U.S.C. § 4942 by deleting that portion of section 4942 which included the language "or the adjusted gross income (whichever is higher)." By doing so, ERTA § 823 effectively limited the meaning of "distributable amount" to "minimum investment return", *i.e.,* 5% of the fair market value of a foundation's assets, in an effort to encourage fund managers to invest in things offering yields greater than 5%. *See Family Foundation,* 97 T.C. at 540.

While this change to section 4942 is consistent with the provisions of 26 U.S.C. § 4947[11] (also part of section 101(b) of the 1969 Act; see *Family Foundation,* 97 T.C. at 539), it is inconsistent with 26 C.F.R. § 53.4942(a)–2(b)(2), which was never revised to reflect the 1981 change made to 26 U.S.C. § 4942 and its definition of "distributable amount". By placing the amended statute alongside the unrevised regulation, the difference between the two becomes obvious: Under the statute, "distributable amount" is effectively limited to a maximum of 5% of the fair market value of a foundation's own assets, while the regulation defines "distributable amount" as beginning with that same 5%, then adding thereto the income portion of trusts (which the IRS seeks to have here defined as including the Trust's entire corpus). In short, the regulation seeks to include all of the Trust's assets in those of the Foundation.[12]

We agree with the Tax Court's conclusion that the unrevised regulation and the amended provision of section 4942 cannot be read as being consistent with each other. Were we to adopt the IRS's position, the Trust's original corpus of $5,000,000 would have to be attributed to the Foundation as its property and not that of the Trust. This not only flies in the face of the clear wording of the governing statute, but perverts the Congressional intent exhibited by the 1981 amendment to that statute, as it would force charitable foundations to give away nearly all of their annual investment income without reinvesting enough to allow those foundations to continue in existence.

---

**10.** Boiled to its essence, a foundation's "minimum investment return" is equal to 5% of the fair market value of its assets. "Minimum investment return" is itself a component of that part of the "distributable amount" of a foundation's "undistributed income", which is subject to tax. *See* 26 U.S.C. § 4942(a), (c), (d). Grossly simplifying the relevant law, a foundation must give away at least 5% of its assets annually in order to retain its tax-exempt status. These definitions are general simplifications, omitting for the sake of clarity various additions and subtractions not here relevant. *See* 26 U.S.C. § 4942(c), (d), and (e).

**11.** That section deals with non-exempt trusts, including split-interest trusts, and was designed to prevent taxpayers from avoiding the restrictions on transfers of property to foundations governed by section 4942. *See Family Foundation,* 97 T.C. at 539 and discussion therein of Senate Report No. 91–552.

**12.** The IRS has also argued that the regulation can be read as including only the Foundation's guaranteed stream of income from the Trust, and not the Trust assets themselves. Whatever the merits to this argument, we note that that is not how the IRS has applied it to the facts of the instant appeal.

Under these circumstances we conclude with the Tax Court that the regulation fails to implement the congressional mandate in a reasonable manner. *See Pacific*, 961 F.2d at 803. Accordingly, the decision appealed from is

**AFFIRMED.**