113 T.C. No. 22


UNITED STATES TAX COURT



UNIONBANCAL CORPORATION, F.K.A. UNION BANK, SUCCESSOR IN INTEREST
TO STANDARD CHARTERED HOLDINGS, INC. AND INCLUDABLE SUBSIDIARIES,
    Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 11364-97.               Filed October 22, 1999.



    In 1984, P was part of a controlled group of
corporations.  On its 1984 Federal income tax return, P
reported an $11.6 million loss resulting from P's sale
of a loan portfolio to its United Kingdom parent
corporation, SC-UK.  United States and United Kingdom
competent authorities subsequently determined that the
actual loss was $87.9 million.  Pursuant to a
settlement agreement for the 1984 taxable year, R
allowed P to deduct $2.3 million of the loss on its
1984 return.  The remaining loss was deferred pursuant
to sec. 267(f), I.R.C.  R determined that under sec.
1.267(f)-1T(c)(6), Temporary Income Tax Regs., 49 Fed.
Reg. 46998 (Nov. 30, 1984), P was not entitled to
deduct the deferred loss in 1988 when it left the
controlled group before the loan portfolio had been
disposed of outside the controlled group.  Instead, R
determined that under sec. 1.267(f)-1T(c)(7), Temporary
Income Tax Regs., supra, SC-UK's basis in the loan

portfolio was increased by the amount of the deferred loss. The United Kingdom has declined to allow SC-UK a stepped-up basis in the loan portfolio.

In 1995, R replaced the temporary regulations under sec. 267(f), I.R.C., with final regulations, effective prospectively. The final regulations operate to restore a deferred loss under sec. 267(f), I.R.C., to the seller when it leaves the controlled group, even if the loss property has not been disposed of outside the controlled group. R denied P's request for elective retroactive application of the final regulations.

Held: Sec. 1.267(f)-1T(c)(6), Temporary Income Tax Regs., supra, is valid. P is not entitled to deduct the $85.6 million loss deferred under sec. 267(f), I.R.C.

Held: Sec. 1.267(f)-1T(c)(6), Temporary Income Tax Regs., supra, does not violate Article 24, paragraph (5) of the United States-United Kingdom Income Tax Treaty, Dec. 31, 1975, 31 U.S.T. 5668.

Held: R's refusal to allow P to elect retroactive application of the 1995 final regulations under sec. 267, I.R.C., is permissible under sec. 7805(b), I.R.C.

Frederick R. Chilton, Jr. and Paolo M. Dau, for petitioner.

Cynthia K. Hustad, for respondent.

THORNTON, Judge: Respondent determined a deficiency in petitioner's corporate Federal income tax for the taxable year ending October 31, 1988, in the amount of $1,676,690. The only issue before the Court is whether respondent erred in refusing to allow petitioner a deduction in the amount of $85,612,820 (representing losses previously deferred pursuant to section 267(f) and arising from petitioner's 1984 sale of certain loans to a member of the same controlled group) when petitioner left

its controlled group in 1988.[1] This question turns on the validity of section 1.267(f)-1T(c)(6), Temporary Income Tax Regs., 49 Fed. Reg. 46998 (Nov. 30, 1984), and the application of section 7805(b).

The parties submitted this case fully stipulated in accordance with Rule 122. The stipulation of facts is incorporated herein by this reference.

FINDINGS OF FACT

Petitioner is a California corporation, with its principal office in San Francisco, California. As described in more detail below, in 1984 petitioner belonged to a controlled group of corporations that included its indirect United Kingdom parent corporation.[2] In 1984, petitioner sold a loan portfolio to its indirect United Kingdom parent corporation, realizing a loss of $87.9 million. Respondent determined that petitioner was permitted to deduct $2.3 million of the losses in taxable year 1984, but pursuant to section 267(f) was required to defer additional losses associated with the sale. In 1988, petitioner left the controlled group, which still held the loan portfolio.

_____

[1] All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Unless otherwise specified, references to petitioner include references to petitioner's predecessor in interest, Union Bank.

Respondent denied petitioner's claim for a deduction in taxable year 1988 for the remaining amount of the loss associated with the sale of the loan portfolio (i.e., $85.6 million).

Organizational Structure and History

On October 31, 1988, and at all prior times relevant hereto, Standard Chartered Holdings, Inc. (Standard Chartered) was the sole shareholder of Union Bancorp, which in turn was the sole shareholder of Union Bank, a U.S. corporation. Standard Chartered Overseas Holdings, Ltd. (SCOH), a United Kingdom corporation, owned all of the stock in Standard Chartered. Standard Chartered Bank (Standard Chartered-U.K.), a United Kingdom corporation, owned all of the stock in SCOH. Therefore, Standard Chartered-U.K. was the indirect parent of Union Bank.

On October 31, 1988, SCOH sold all its stock in Standard Chartered to California First Bank, an unrelated party. On November 1, 1988, Standard Chartered and its subsidiaries, Union Bancorp and Union Bank, were liquidated into California First Bank. California First Bank then changed its name to Union Bank.

On April 1, 1996, BanCal Tri-State Corp., a Delaware corporation and parent of The Bank of California, merged into Union Bank, with Union Bank surviving. Union Bank transferred all the assets of its banking business to The Bank of California, and Union Bank then changed its name to petitioner's present name, UnionBanCal Corp.

The 1984 Sale of the Loan Portfolio

On December 31, 1984, Union Bank sold to Standard Chartered-U.K. loans that it had made to various foreign countries (the loan portfolio). The sales price was $422,985,520. The face value of the loan portfolio was $434,557,415.

On October 31, 1988, when SCOH sold all its stock in Standard Chartered to California First Bank, the loan portfolio had not been disposed of outside of the controlled group. Standard Chartered-U.K. transferred the loan portfolio outside of the controlled group in 1989.

Tax Treatment of the Loan Portfolio Sale for Taxable Year 1984

On its 1984 corporate Federal income tax return, petitioner claimed a loss of $11,571,895 in connection with the sale of the loan portfolio, corresponding to the difference between petitioner's basis in the loan portfolio ($434,557,415) and the sales price ($422,985,520). In 1995, in the course of respondent's Appeals Office review of the audit determinations for the 1984 taxable year, petitioner filed an amended Federal income tax return for its 1984 taxable year, claiming a revised loss of $84,079,067 on the sale of the loan portfolio to Standard Chartered-U.K. Respondent denied this affirmative adjustment.

Petitioner and respondent reached a partial appeals settlement for taxable year 1984, under which respondent allowed petitioner a loss deduction in 1984 in the amount of $2,314,379,

which represented 20 percent of the loss claimed on petitioner's original 1984 return.  Remaining losses associated with the sale of the loan portfolio were deferred pursuant to section 267(f).[3]

Tax Treatment of the Loan Portfolio Deferred Loss for Taxable Year 1988

On its Federal income tax return for taxable year 1988, petitioner originally claimed no deduction for any loss resulting from the sale of the loan portfolio in 1984.  Instead, as previously discussed, petitioner initially sought to deduct such losses with respect to its 1984 taxable year.  The settlement of its 1984 taxable year having resulted in an allowance for that year of only $2,314,379 of the losses, petitioner sought an affirmative adjustment for its 1988 taxable year, claiming that losses deferred from the 1984 loan portfolio sale should be restored to petitioner on October 31, 1988, when it left the Standard Chartered controlled group.  Respondent disallowed petitioner's claim.

The Competent Authority Process

For United Kingdom income tax purposes, Standard Chartered-U.K. claimed losses with respect to the loan portfolio predicated

---

[3]  The appeals settlement left unresolved the value of the loan portfolio at the time of its sale to Standard Chartered-U.K. Accordingly, the amount of any loss deferred under sec. 267 was not determined as part of the settlement agreement.

on the loan portfolio's having a United Kingdom tax basis of $422,985,520.  In examining Standard Chartered-U.K.'s tax returns for 1984 and certain subsequent years, the United Kingdom Inland Revenue determined that Standard Chartered-U.K.'s tax basis in the loan portfolio was overstated and consequently that its allowable losses therefrom should be reduced for United Kingdom income tax purposes.

In 1996, petitioner requested competent authority assistance to resolve the value of the loan portfolio on December 31, 1984, the amount of the loss realized on that date upon the sale of the loan portfolio, and the proper treatment of the loss realized. The United States Competent Authority and the United Kingdom Competent Authority agreed that the value of the loan portfolio on December 31, 1984, was $346,630,214 and that petitioner's loss on the sale was $87,927,200.  The competent authorities were unable, however, to resolve the tax treatment of this loss.  The United States would not withdraw its adjustment disallowing the loss to petitioner.  In addition, the United Kingdom would not allow Standard Chartered-U.K. to increase its basis in the loan portfolio to reflect the loss disallowed petitioner for U.S. income tax purposes.

Petitioner has not returned to Standard Chartered-U.K. the excess of the amount received from it for the loan portfolio over

the value of the loan portfolio as determined under the competent
authority process.[4]

### OPINION

Section 267(a)(1) generally disallows losses from the sale
or exchange of property between related parties, as defined in
section 267(b).  If a loss is disallowed under section 267(a)(1),
subsection (d) generally provides a corresponding reduction in
the amount of any gain the related purchaser must recognize on a
subsequent resale of the property.[5]

---

[4] In its letter to petitioner, the United States Competent
Authority stated:

> The determination made by the competent authorities
> results in improperly lodged funds in the U.S. to the extent
> of the reduction in the transfer price (i.e., $76,355,304).
> Since * * * [petitioner] and * * * [Standard Chartered-U.K.]
> elect not to repatriate the funds, the $76,355,304 amount
> will be treated as a contribution to the capital of * * *
> [petitioner] by * * * [Standard Chartered-U.K.] during the
> 1984 taxable year.

[5] Sec. 267(a) and (d) provides in pertinent part:

(a) In General.--

> (1) Deduction for losses disallowed.--No deduction
> shall be allowed in respect of any loss from the sale
> or exchange of property * * *, directly or indirectly,
> between persons specified in any of the paragraphs of
> subsection (b).

> *       *       *       *       *       *       *

(d) Amount of Gain Where Loss Previously Disallowed.--If--

> (1) in the case of a sale or exchange of property to
> (continued...)

Section 267(f) prescribes special rules for losses incurred on the sale or exchange of property between related taxpayers that are members of the same controlled group.[6]  Section 267(f)(2) provides:

> (2) Deferral (rather than denial) of loss from sale or exchange between members.--In the case of any loss from the sale or exchange of property which is between members of the same controlled group and to which subsection (a)(1) applies (determined without regard to this paragraph but with regard to paragraph (3))--
>
> > (A) subsections (a)(1) and (d) shall not apply to such loss, but
> >
> > (B) such loss shall be deferred until the property is transferred outside such controlled group and there would be recognition of loss under consolidated return principles or until such other time as may be prescribed in regulations.

---

[5](...continued)
the taxpayer a loss sustained by the transferor is not allowable to the transferor as a deduction by reason of subsection (a)(1) * * *; and

> (2) * * * the taxpayer sells or otherwise disposes of such property * * * at a gain,

then such gain shall be recognized only to the extent that it exceeds so much of such loss as is properly allocable to the property sold or otherwise disposed of by the taxpayer. * * *

[6]  For this purpose, a controlled group is determined under the rules provided in sec. 1563(a), except that stock ownership of more than 50 percent is substituted for the requirement in sec. 1563 for stock ownership of at least 80 percent.  See sec. 267(f)(1).  It is undisputed that Standard Chartered-U.K. and Union Bank were part of the same controlled group at the time of the sale of the loan portfolio and immediately thereafter.  Cf. Turner Broad. Sys., Inc. & Subs. v. Commissioner, 111 T.C. 315, 329-338 (1998).

In November 1984, respondent promulgated 1.267(f)-1T, Temporary Income Tax Regs., 49 Fed. Reg. 46992 (Nov. 30, 1984) (the Temporary Regulation). The Temporary Regulation provides generally that consolidated return principles apply under section 267(f)(2) to the deferral and restoration of loss on the sale or exchange of property between member corporations of a controlled group. See sec. 1.267(f)-1T(c)(1), Temporary Income Tax Regs., 49 Fed. Reg. 46998 (Nov. 30, 1984). As in effect for the years in issue, the consolidated return rules for deferred intercompany transactions generally defer a loss on a sale to another controlled group member and allow for the deferred intercompany loss to be taken into account by the selling member upon the earliest of various specified dates. See sec. 1.1502-13(c)(1)(i), (f)(1), Income Tax Regs.[7] One such specified date is the date immediately preceding the time when either the selling member or the member which owns the property ceases to be a member of the controlled group. See sec. 1.1502-13(f)(1)(iii), Income Tax Regs.; see also <u>Turner Broad. Sys., Inc. & Subs. v. Commissioner</u>, 111 T.C. 315, 334-337 (1998).

---

[7] Sec. 1.1502-13, Income Tax Regs., as in effect in the taxable year at issue was repromulgated in 1995 in T.D. 8597, 1995-2 C.B. 147, which also included the 1995 final regulations under sec. 267(f).

The Temporary Regulation contains a number of exceptions to this general rule.  One exception (the Loss Restoration Exception) states as follows:

> (6) Exception to restoration rule for selling member that ceases to be a member.  If a selling member of property for which loss has been deferred ceases to be a member when the property is still owned by another member, then, for purposes of this section, sec. 1.1502-13(f)(1)(iii) shall not apply to restore that deferred loss and that loss shall never be restored to the selling member.  [Sec. 1.267(f)-1(T)(c)(6), Temporary Income Tax Regs., 49 Fed. Reg. 46998 (Nov. 30, 1984).]

If the Loss Restoration Exception applies, then the Temporary Regulation provides a basis adjustment (the Basis Shift Exception) to the purchasing member as follows:

> (7) Basis adjustment and holding period.  If paragraph (c)(6) of this section precludes a restoration for property, then the following rules apply:
>
>> (i) On the date the selling member ceases to be a member, the owning member's basis in the property shall be increased by the amount of the selling member's unrestored deferred loss at the time it ceased to be a member * * *. [Sec. 1.267(f)-1(T)(c)(7), Temporary Income Tax Regs., 49 Fed. Reg. 46998 (Nov. 30, 1984).]

The Temporary Regulation remained in force until superseded by the final regulation, section 1.267(f)-1, Income Tax Regs. (the Final Regulation).  The Final Regulation is prospective only and applies with respect to transactions occurring in years beginning on or after July 12, 1995.  See T.D. 8597, 1995-2 C.B. 147, 160-161.  Under the Final Regulation, consolidated return principles apply to restore the deferred loss to the seller when

it leaves the controlled group, even if the loss property has not been disposed of outside the controlled group. See secs. 1.267(f)-1(a)(2), 1.1502-13(f)(1)(iii), Income Tax Regs.

Petitioner challenges the validity of the Loss Restoration Exception. Petitioner asserts that the Temporary Regulation violates the plain meaning and intent of section 267(f) by effectively denying it the deferred loss on its 1984 loan portfolio sale. In addition, petitioner argues that the Temporary Regulation violates the U.S. income tax treaty with the United Kingdom. See The Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668 (hereinafter U.S.-U.K. treaty). Finally, petitioner argues that respondent's refusal to allow it to elect retroactive application of the Final Regulation is not authorized by section 7805(b).

## I. Validity of the Temporary Regulation

### A. Standard of Review

A legislative regulation "is entitled to greater deference than an interpretive regulation, which is promulgated under the general rulemaking power vested in the Secretary by section 7805(a)." Romann v. Commissioner, 111 T.C. 273, 281 (1998); see

Ann Jackson Family Found. v. Commissioner, 15 F.3d 917, 920 (9th Cir. 1994), affg. 97 T.C. 534 (1991); Greenberg Bros. Partnership #4 v. Commissioner, 111 T.C. 198, 205 (1998); Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996). As stated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-844 (1984):

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

See also Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-257 (1995).

The Temporary Regulation is a legislative regulation because it was promulgated under the specific delegation of authority contained in section 267(f)(2)(B). See Coca-Cola Co., & Includible Subs. v. Commissioner, 106 T.C. 1, 19 (1996) ("A legislative regulation is made pursuant to a specific grant of authority, often without precise congressional guidance, to define a statutory term or prescribe a method of executing a statutory provision."); see also Romann v. Commissioner, 111 T.C. 273, 281-282 (1998); Schwalbach v. Commissioner, 111 T.C. 215, 222-223 (1998). Contrary to petitioner's assertion, the mere fact that the Temporary Regulation may embody interpretations of the operative statutory language does not alter its

characterization as a legislative regulation.  Cf. <u>Batterton v. Francis</u>, 432 U.S. 416, 425 (1977); <u>Levesque v. Block</u>, 723 F.2d 175, 183 (1st Cir. 1983).

As a general proposition, temporary regulations are entitled to the same deference we accord final regulations.  See <u>Schaefer v. Commissioner</u>, 105 T.C. 227, 229 (1995); <u>Peterson Marital Trust v. Commissioner</u>, <u>supra</u> at 797; <u>Truck & Equip. Corp. v. Commissioner</u>, 98 T.C. 141, 149 (1992).  The Temporary Regulation was promulgated without notice and public comment procedures.[8] Petitioner argues that the Temporary Regulation therefore is not entitled to <u>Chevron</u> deference, citing <u>Bankers Life & Cas. Co. v.</u>

---

[8] The Treasury Decision in which the Temporary Regulation was promulgated explained the absence of notice and public comment procedures as follows:

> There is a need for immediate guidance with respect to the provisions contained in this Treasury decision.  For this reason, it is found impracticable to issue this Treasury decision with notice and public procedure under subsection (b) of section 553 of Title 5 of the United States Code * * *. [T.D. 7991, 1985-1 C.B. 71, 81.]

Under the Administrative Procedure Act, 5 U.S.C. sec. 553(b)(3)(B) (1984), notice and public comment procedures are not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

Petitioner does not contend that the Temporary Regulation is invalid for failure to comply with notice and public comment procedures or to meet the requirements of the good cause exception cited above.  Accordingly, we do not reach these issues.

United States, 142 F.3d 973, 981 (7th Cir. 1998).[9]  We need not

resolve this question, however, for we conclude that the

Temporary Regulation is valid even under the traditional standard

of review for interpretive regulations as articulated in National

Muffler Dealers Association, Inc. v. United States, 440 U.S. 472,

476 (1979).  Cf. Union Carbide Corp. v. Commissioner, 110 T.C.

375, 388 (1998); Sim-Air, USA, Ltd. v. Commissioner, 98 T.C. 187,

194 (1992).  Under that standard, we must defer to respondent's

regulations if they "implement the congressional mandate in some

reasonable manner."  National Muffler Dealers Association, Inc.

v. United States, supra at 476.  The critical inquiry is "whether

the regulation harmonizes with the plain language of the statute,

---

[9]  In Bankers Life & Cas. Co. v. United States, 142 F.3d 973, 981 (7th Cir. 1998), the Court of Appeals for the Seventh Circuit followed Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and accorded deference to interpretive regulations issued under sec. 7805(a) with notice and comment procedures.  The court cited Atchison, Topeka & Santa Fe Ry. v. Pena, 44 F.3d 437 (7th Cir. 1994), for the proposition that "the notice and comment procedure was the sine qua non for Chevron deference."  The court in Bankers Life & Cas. Co. did not address the appropriate standard of review for legislative regulations issued without notice and comment procedures.

In Kikalos v. Commissioner, ___ F.3d ___ (7th Cir. 1999), revg. in part T.C. Memo. 1998-92, the Court of Appeals for the Seventh Circuit sua sponte raised the issue of the degree of deference owed to temporary interpretive regulations issued by respondent under section 163 without notice and comment procedures.  Because both parties assumed that Chevron deference applied in this circumstance, the court reserved judgment on whether a lesser degree of deference was appropriate.

its origin, its purpose." Id.; see also Ann Jackson Family
Found. v. Commissioner, 15 F.3d at 920.

B. The Parties' Positions

The parties have stipulated that petitioner realized a loss
of $87,927,200 on the sale of the loan portfolio to Standard
Chartered. The parties also agree that section 267(f) provides
for deferral rather than denial of losses arising from sales
between corporations that are members of the same controlled
group. The crux of their disagreement is whether the deferred
loss must be restored to petitioner, or whether the Temporary
Regulation permissibly denies the loss to petitioner, allowing
instead a basis adjustment to the purchasing member of the
controlled group.

1. Does the Temporary Regulation Violate the Mandate of the
Statute?

Petitioner argues that the Temporary Regulation imposes a
result expressly prohibited by the statute. Specifically,
petitioner notes that section 267(a)(1), if applicable, would
disallow the seller's loss, with a corresponding reduction under
subsection (d) of any subsequent gain by the purchaser upon
resale of the loss property outside the controlled group.
Section 267(f)(2)(A), however, states that subsections (a)(1) and
(d) "shall not apply" to loss sales between controlled group
members. Therefore, petitioner concludes, in the case of loss

sales between controlled group members, "If the seller's loss may not be disallowed to the seller, then of necessity it must eventually be allowed to the seller, i.e., restored to it." Petitioner argues that, as applied to petitioner, the Temporary Regulation impermissibly imposes the loss disallowance rule of section 267(a)(1) and reinstates the gain-reduction rule of section 267(d).

We disagree. By rendering inapplicable the general rules contained in subsections (a)(1) and (d), section 267(f)(2)(A) simply makes operable the special rules of subsection (f). Those special rules indicate that when the selling member leaves the controlled group before the loss property is disposed of outside the group, the loss is deferred until such time as may be prescribed in regulations.

The Temporary Regulation does not replicate the loss disallowance and gain adjustment mechanisms of subsections (a)(1) and (d). Generally speaking, under subsection (a)(1) the loss is denied absolutely, not only to the seller but to any party. The gain-reduction adjustment under subsection (d) mitigates the subsection (a)(1) loss disallowance only where the transferee subsequently resells the loss property at a gain. By contrast, the Temporary Regulation generally preserves the deferred loss in the controlled group for U.S. income tax purposes by means of a

basis adjustment that applies without regard to whether the loss property is subsequently resold at a gain or loss.

2. Does the Temporary Regulation Permissibly Accrue the Benefit of the Deferred Loss to the Purchasing Member Rather Than to the Selling Member?

Petitioner argues that recognition of the deferred loss by the purchasing party is inconsistent with a general principle that allowable losses should be confined to the taxpayer sustaining them, citing various cases, including New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440-441 (1934). Section 267, however, constitutes a statutory exception to any such general principle. Losses otherwise allowable under section 165 are disallowed under section 267 to prevent abuses resulting from the generation of loss deductions by persons with common economic interests. See Davis v. Commissioner, 88 T.C. 122 (1987), affd. 866 F.2d 852 (6th Cir. 1989); Hassen v. Commissioner, 63 T.C. 175 (1974), affd. 599 F.2d 305 (9th Cir. 1979).

In McWilliams v. Commissioner, 331 U.S. 694 (1947), the Supreme Court thoroughly considered and explained the purposes of section 24(b) of the Internal Revenue Code of 1939, which was the predecessor to section 267:

Section 24(b) states an absolute prohibition--not a presumption--against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought

to result, usually, in economically genuine realizations of
loss, and accordingly that Congress did not deem them to be
appropriate occasions for the allowance of deductions.
* * *

We conclude that the purpose of section 24(b) was to put
an end to the right of taxpayers to choose, by intra-family
transfers and other designated devices, their own time for
realizing tax losses on investments which, for most
practical purposes, are continued uninterrupted. [Id. at
699-700; fn. ref. omitted.]

In sum, under section 267(a)(1), to the extent that a

property sale between related taxpayers gives rise to an

otherwise deductible loss to the seller, it is a loss that is

neither recognized nor allowed.  For purposes of this rule, it is

irrelevant whether the sale was bona fide.  "Congress obviously

did not want the courts to face the difficult task of looking

behind the sales.  Instead, Congress made its prohibition

absolute in reach, believing that this would be fair to the great

majority of taxpayers."  Miller v. Commissioner, 75 T.C. 182, 189

(1980).

In Turner Broad. Sys., Inc. & Subs. v. Commissioner, 111

T.C. 315, 332-333 (1998), we concluded that the special rules of

section 267(f) reflect an extension of the related party

provisions of section 267(a)(1):

The legislative history regarding section 267(f)
indicates that it was intended to "extend" the related party
provisions of section 267 even though subsection (f)(2)(A)
makes subsections (a)(1) and (d) inapplicable.
Nevertheless, there is a general theme that runs through the
gain recognition limitation in section 267(d) and the loss
deferral provisions of subsection (f) in that they both

prevent an immediate loss deduction to the seller and accrue the loss either in terms of a limited gain recognition to the purchaser pursuant to section 267(d) or as a deferral of the tax benefit of the loss pursuant to section 267(f). <u>We think what Congress intended to 'extend' was the class of transaction in which there would be a delay, of some kind, in the recognition of a loss until there was an economically genuine realization of the loss</u>. [Fn. ref. omitted; emphasis added.]

Consistent with this rationale, the Temporary Regulation reasonably interprets section 267(f) as requiring deferral until the loss property is disposed of outside the controlled group, at which time there is an economically genuine realization of the loss.

Nothing in the statutory language expressly mandates that the benefit of the deferred loss accrue to the seller. Petitioner cites various cases, including <u>Hassen v. Commissioner</u>, <u>supra</u>, and <u>Grady Whitlock Leasing Corp. v. Commissioner</u>, T.C. Memo. 1997-405, for the proposition that the loss that is disallowed under section 267(a)(1) is the seller's loss. Therefore, petitioner concludes, the loss that is deferred under section 267(f) must be the seller's loss, rather than the controlled group's loss, and must be restored to the seller. The cited cases, however, add nothing to the analysis other than to show that section 267(a)(1) does not permit recognition of the loss putatively sustained by the seller. The statute does not otherwise identify the disallowed loss with the seller. To the contrary, the gain-reduction adjustment under subsection (d)

explicitly identifies the loss with the property transferred and not with the seller.  Specifically, subsection (d) provides that where the "loss sustained by the transferor" is disallowed under subsection (a)(1), the "loss * * * properly allocable to the property sold or otherwise disposed of" reduces any gain recognized by the transferee.  Similarly, the Temporary Regulation effectively identifies the deferred loss with the loss property by means of a basis adjustment.

Petitioner argues that the use of the verb "defer" in section 267(f) necessarily denotes postponement and restoration of the seller's loss to the seller.  Under the literal language of the statute, however, what is deferred under section 267(f)(2)(B) is not the seller's recognition of the seller's loss, but rather the "loss" itself.  Under the Temporary Regulation, this loss is not recognized by the seller or any other party while the controlled group continues to hold the loss property.  Rather, the loss is recognized only when the loss property leaves the controlled group.  This result is within the statutory delegation of authority to the Treasury Department.

3.  <u>The Temporary Regulation Is Consistent With the Pertinent Legislative History</u>.

This result also harmonizes with the purpose of the statute to prevent premature recognition of losses among related taxpayers.  Before the enactment of subsection (f) in 1984,

section 267 had long included certain controlled corporations within the definition of related parties under section 267(b) that were subject to the general loss disallowance and gain adjustment provisions of subsections (a)(1) and (d).[10] When Congress created the special rules of section 267(f), it also enlarged the class of controlled corporations defined as related parties, to curb further the sorts of abuses that section 267 was meant to address:

> Congress believed that certain related parties, such as
> * * * controlled corporations should be made subject to the
> related party rules in order to prevent tax avoidance on
> transactions between those parties. [Staff of Joint Comm. on
> Taxation, General Explanation of the Revenue Provisions of
> the Deficit Reduction Act of 1984, at 542 (J. Comm. Print
> 1985).]

The House bill would have simply applied the general loss disallowance rules of section 267(a)(1) to the expanded class of controlled corporations.[11] The Senate bill followed the House

---

[10] Prior to amendment in 1984, sec. 267(b)(3) defined as related taxpayers:

> Two corporations more than 50 percent in value of the
> outstanding stock of each of which is owned, directly or
> indirectly, by or for the same individual, if either one of
> such corporations, with respect to the taxable year of the
> corporation preceding the date of the sale or exchange was,
> under the law applicable to such taxable year, a personal
> holding company or a foreign personal holding company.

[11] The House report stated:

> the bill extends the loss disallowance and accrual
>                                               (continued...)

bill in its expanded definition of related taxpayers, but
provided special rules for sales or exchanges between controlled
group members.  The Senate bill generally would have allowed the
party transferring property to a member of the same controlled
group to recognize the loss in the year that the loss property
was disposed of outside the controlled group.[12]

_____

[11](...continued)
provisions of section 267 * * * to transactions between
certain controlled corporations.  For purposes of these
loss disallowance and accrual provisions, corporations
will be treated as related persons under the controlled
corporation rules of section 1563(a), except that a 50-
percent control test will be substituted for the 80-
percent test.  (These rules are not intended to
overrule the consolidated return regulation rules where
the controlled corporations file a consolidated
return.) [H. Rept. 98-432 (Vol. 2), at 277 (1984); fn.
ref. omitted.]

[12] Section 180 of the Senate bill provided in pertinent
part:
(c) Deferral (Rather Than Denial) of Loss From Sale or
Exchange Between Members of a Controlled Group.--Section 267
* * * is amended by adding at the end thereof the following
new subsection:
"(g) Deferral of Losses From Sales or Exchanges Between
Members of Controlled Groups.--In the case of any loss from
a sale or exchange of property between members of the same
controlled group to which subsection (a)(1) applies
(determined without regard to this subsection)--
"(1) subsections (a)(1) and (d) shall not apply to
such loss, but
"(2) no deduction shall be allowed with respect to
such loss to the transferor of such property until the
first taxable year of such transferor in which the
transferee--
(A) sells, exchanges or otherwise disposes of
such property (or exchanged basis property with
respect to such property) to a person other than a
(continued...)

The Senate report stated in pertinent part:

> The bill extends the loss disallowance and accrual provisions of section 267 * * * to transactions between certain controlled corporations.  For purposes of these loss disallowance and accrual provisions, corporations will be treated as related persons under the controlled corporation rules of section 1563(a), except that a 50-percent control test will be substituted for the 80-percent test.  These rules are not intended to overrule the consolidated return regulation rules where the controlled corporations file a consolidated return.  <u>In the case of controlled corporations, losses will be deferred until</u> the property is disposed of * * * by the affiliate to an unrelated third party in a transaction which results in a recognition of gain or loss to the transferee, or <u>the parties are no longer related</u>.  In a transaction where no gain or loss is recognized by the transferee, the loss is deferred until the substitute basis property is disposed of. [S. Print 98-169 (Vol. 1), at 496 (1984); fn. ref. omitted; emphasis added.]

In support of its position, petitioner relies upon the underscored Senate report language <u>supra</u>.  This report language was dropped, however, in the conference committee report, which stated as follows:

> The provision generally follows the Senate amendment with the following modifications:
>
> \*    \*    \*    \*    \*    \*    \*
>
>     (3) The operation of the loss deferral rule is clarified to provide that any loss sustained shall be deferred until the property is transferred outside the group, or until such other time as is provided by regulations.  These rules will apply to taxpayers who have elected not to apply the

---

[12](...continued)
          member of such controlled group (determined as of the time of the disposition), and
               (B) recognizes gain or loss on such disposition".  [S. Print 98-169 (Vol. 2), at 520-521 (1984).]

deferral intercompany transactions rules, except to the extent regulations provide otherwise. [H. Conf. Rept. 98-861, at 1033 (1984), 1984-3 C.B. (Vol. 2) 1, 287.]

Petitioner argues that the indication in the conference committee report that it "generally" follows the Senate bill reflects a legislative intent to adopt the sense of the Senate report language in question without expressly repeating it. We are unpersuaded that this is so. It is clear that the conference committee report "generally" follows the Senate bill by including special rules for transfers between controlled group members, unlike the House bill, which contained no such special rules. It is also clear that the special rules actually adopted by the conference committee (and enacted into law) differ significantly from the Senate bill. Among these differences is the omission of the Senate provision requiring that the deferred loss be restored to the transferor. It seems clear that Congress, having considered the issue, ultimately rejected any mandate that the deferred loss be recognized by the transferor when it leaves the controlled group. Instead, Congress specified that the deferral lasts until the property is transferred outside the controlled group, or until such other time as regulations may prescribe.

   4.  Relevance of Purchasing Member's Tax Treatment Under United Kingdom Tax Law.

In the final analysis, petitioner's argument that the Temporary Regulation is invalid rests on the United Kingdom's

refusal to allow Standard Chartered-U.K. to recognize the loss. Petitioner contends that, in this specific fact situation, because the United Kingdom denied the loss for United Kingdom tax purposes to the member of the controlled group who bought the property, the Temporary Regulation has the effect of denying and not deferring the loss, contrary to section 267(f).

We disagree. Under the Temporary Regulation, Standard Chartered-U.K. was entitled under U.S. tax law to have its basis in the loan portfolio increased for U.S. income tax purposes. The inability of Standard Chartered-U.K. to avail itself of the deferred loss under United Kingdom tax law is irrelevant. Had petitioner transferred the loan portfolio to a U.S. affiliate, or had its foreign affiliates been located outside the United Kingdom, the results might have been different. We agree with respondent that the validity of the Temporary Regulation cannot depend upon the treatment of the deferred loss under foreign tax law. Cf. United States v. Goodyear Tire & Rubber Co., 493 U.S. 132, 143-145 (1989); Biddle v. Commissioner, 302 U.S. 573, 578-579 (1938).

5. Effect of the Final Regulation on the Validity of the Temporary Regulation.

Petitioner contends that the Loss Restoration Exception in the Temporary Regulation is "diametrically, fundamentally and precisely opposed" to the treatment of deferred losses under the

Final Regulation, and that both cannot be reasonable interpretations of the statute. Petitioner contends that the Final Regulation is evidence that the Temporary Regulation was in error.

We are unpersuaded by petitioner's arguments. After receiving public comments on the Temporary Regulation, the Treasury Department adopted the changes incorporated in the Final Regulation, explaining that it was simplifying the rules to correspond more closely to the consolidated return rules.[13] It is well established that "the agency administering the statute has flexibility to change a regulation in the light of administrative experience." Central Pa. Sav. Association & Subs. v.

---

[13] The Notice of Proposed Rulemaking for the proposed 1995 regulations states:

> The proposed regulations retain the basic approach of the current regulations but simplify their operation by more generally incorporating the consolidated return rules.

> The proposed regulations eliminate the rule that transforms S's [selling member's] loss into additional basis in the transferred property when S ceases to be a member of the controlled group. Instead, the proposed regulations generally allow S's loss immediately before it ceases to be a member. This conforms to the consolidated return rules, and eliminates the need for special rules. An anti-avoidance rule is adopted, however, to prevent the purposes of section 267(f) from being circumvented, for example, by using the proposed rule to accelerate S's loss. [Notice of Proposed Rulemaking, Consolidated Groups and Controlled Groups-- Intercompany Transactions and Related Rules, reprinted in 1994-1 C.B. 724, 732.]

<u>Commissioner</u>, 104 T.C. 384, 390 (1995).  Moreover, a Treasury regulation "is not invalid simply because the statutory language will support a contrary interpretation."  <u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. 16, 26 (1982).  The question is "not whether the Treasury Regulation represents the best interpretation of the statute, but whether it represents a reasonable one."  <u>Atlantic Mut. Ins. Co. v. Commissioner</u>, 523 U.S. 382, 389 (1988).  As discussed above, the Temporary Regulation is a reasonable interpretation of section 267(f).

II.  <u>The Temporary Regulation Does Not Violate the United States-United Kingdom Income Tax Treaty</u>

Petitioner argues that the Temporary Regulation is inconsistent with Article 24, paragraph (5) of the U.S.-U.K. treaty, which provides as follows:

> Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned Contracting State to any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

Neither section 267(f) nor the Temporary Regulation discriminates between United Kingdom taxpayers and U.S. taxpayers, or between U.S. taxpayers owned by United Kingdom interests and U.S. taxpayers not owned by United Kingdom

interests.  For U.S. income tax purposes, petitioner was treated no differently than any other U.S. taxpayer.

Petitioner argues that the Temporary Regulation discriminates against U.S. subsidiaries owned by foreign purchasing members without effectively connected income, because "losses sustained by such subsidiaries are uniformly denied" under the Temporary Regulation, in the absence of competent authority intervention.  Petitioner argues that this "requirement of competent authority intervention, entirely avoided by a U.S. corporation with a U.S. parent," is more burdensome than requirements imposed on U.S.-owned corporations, in contravention of Article 24 of the U.S.-U.K. treaty.

Petitioner's argument is without merit.  The operation of neither section 267(f) nor the Temporary Regulation is conditioned on the country of incorporation of the taxpayer's parent, but rather on the taxpayer's selling property at a loss to members of the same controlled group, without reference to where those related parties may be incorporated.  A U.S. corporation with a U.S. parent would face the same burdens and requirements as petitioner, all other things being equal, if it sold property at a loss to a United Kingdom corporation that was a member of the same controlled group.  Conversely, a U.S. corporation with a United Kingdom parent might sell property to a U.S. affiliate without implicating the competent authority

process. We agree with respondent that petitioner's problem, to the extent it has one, does not arise under U.S. income tax law but under United Kingdom tax law, which has not given effect to the increase in Standard Chartered-U.K.'s basis as provided under the Temporary Regulation. The failure of the competent authority process to resolve this inconsistent treatment under U.S. and U.K. tax laws is unfortunate, but it does not reflect upon the validity of either section 267(f) or the Temporary Regulation.

III. Respondent's Authority To Limit the Retroactive Effect of the Final Regulation

During the administrative proceedings of this case, petitioner requested elective retroactive application of the Final Regulation. In a January 16, 1997, Technical Advice Memorandum, respondent denied petitioner's request. Petitioner argues that respondent's denial was not authorized by section 7805(b).

Section 7805(b) provides:

> (b) Retroactivity of Regulations or Rulings.-- The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.[14]

---

[14] Sec. 7805(b) was amended in 1996, effective for regulations that relate to statutory provisions enacted on or after July 30, 1996. See Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 1101(b), 110 Stat. 1452, 1469 (1996). Accordingly, the amendments are inapplicable to the instant case.

Section 7805(b) "sets out a blanket rule which specifically permits the Commissioner to prescribe prospective effect to regulations which would otherwise have retroactive application." Wendland v. Commissioner, 79 T.C. 355, 381-382 (1982), affd. 739 F.2d 580 (11th Cir. 1984), also affd. sub nom. Redhouse v. Commissioner, 728 F.2d 1249 (9th Cir. 1984).  Under section 7805(b), there is a presumption that every regulation will operate retroactively, unless the Secretary specifies otherwise. See Manocchio v. Commissioner, 710 F.2d 1400, 1403 (9th Cir. 1983), affg. 78 T.C. 989 (1982); Butka v. Commissioner, 91 T.C. 110, 129 (1988), affd. 886 F.2d 442 (D.C. Cir. 1989).  In the instant case, the Secretary did specify otherwise and, in doing so, clearly acted within his authority.  See Butka v. Commissioner, supra at 129 ("Section 7805(b) certainly gives [the Secretary] authority to provide, if he so chooses, that the new regulation will operate only prospectively").

Petitioner argues that respondent's exercise of his authority to issue prospective regulations, being discretionary, is reviewable for abuse of discretion.  Petitioner states on brief:

> Petitioner submits that when retroactive application of a regulation would not have inequitable results, Respondent does not have the authority to limit retroactivity. Congress only gave Respondent the discretion to prevent retroactivity to the extent required in order to avoid undue hardship or discrimination.

Neither the express language of section 7805(b) nor its legislative history, however, contains any suggestion of such conditions on the Secretary's authority to issue prospective regulations.  To the contrary, the pertinent legislative history indicates that section 7805(b) was intended to prevent problems that might otherwise arise from retroactive application of regulations, rather than to restrict the Secretary's ability to promulgate prospective regulations.

The predecessor to section 7805(b) was enacted in the Revenue Act of 1921, ch. 136, section 1314, 42 Stat. 227.  The legislative history states that the purpose of the 1921 provision was to--

> permit the Treasury Department to apply without retroactive effect a new regulation or Treasury decision reversing a prior regulation of Treasury decision * * *.  This would facilitate the administration of the internal revenue laws in that it would make it unnecessary to reopen thousands of settled cases.  [H. Rept. 350, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 168, 180; emphasis added.]

In 1934, the 1921 provision was reenacted with various substantive amendments that are not central to the present discussion.  The pertinent legislative history to the 1934 legislation states:

> The amendment extends the right granted by existing law to the Treasury Department to give regulations and Treasury decisions amending prior regulations or Treasury decisions prospective effect only, by allowing the Secretary * * * to prescribe the exact extent to which any regulation or Treasury decision, whether or not it amends a prior regulation or Treasury decisions, will be applied without

retroactive effect. * * * Regulations, Treasury decisions, and rulings which are merely interpretive of the statute, will normally have a universal application, but in some cases <u>the application of regulations, Treasury decisions, and rulings to past transactions which have been closed by taxpayers in reliance upon existing practice</u>, will work such inequitable results that it is believed desirable to lodge in the Treasury Department the power to avoid these results by applying certain regulations, Treasury decisions, and rulings with prospective effect only. [H. Rept. 704, 73d Cong. 2d Sess. (1934), 1939-1 C.B. (Part 2) 554, 583; emphasis added.]

This is not a case where petitioner alleges detrimental reliance upon an existing practice that would be undone by retroactive application of new regulations. Moreover, petitioner's suggestion that section 7805(b) requires respondent to apply regulations retroactively if they would be beneficial to the taxpayer raises significant administrability problems of the sort which section 7805(b) was intended to prevent.

Petitioner has cited, and we have discovered, no case constraining the Secretary's authority to issue prospective regulations. In support of its position, petitioner cites various cases, including <u>Automobile Club of Mich. v. Commissioner</u>, 353 U.S. 180, 184 (1957), for the proposition that, in enacting the predecessor to section 7805(b), Congress gave respondent the authority "to limit retroactive application to the extent necessary to avoid inequitable results". The <u>Automobile Club of Mich.</u> case, however, like all the other cases cited by petitioner, deals with respondent's obligation to limit

retroactivity to avoid inequitable results when taxpayers have entered into transactions in reliance on past regulations.  That concern is simply not relevant when the taxpayer is requesting retroactive application of a new regulation.

Remaining contentions not addressed herein we deem irrelevant, without merit, or unnecessary to reach.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under Rule 155</u>.